Anthony Mousette, Appellee, v. Monarch Life Insurance Company, Appellant.

Opinion filed March 1, 1941.

POPE & DRIEMEYER, of East St. Louis, for appellant.

WHITNEL, BROWNING, LISTEMAN & WALKER, of East St. Louis, for appellee.

MR. JUSTICE CULBERTSON delivered the opinion of the court.

This is an appeal from a final decree of the city court of the city of East St. Louis, Illinois, entered March 13, 1940, against the defendant appellant, Monarch Life Insurance Company (hereinafter called the defendant), in the sum of $2,217.26, and costs for the principal, with interest, on a policy of life insurance upon the life of Peter A. Mousette. The suit was transferred from the law to the equity side of the court, in accordance with the provisions of section 44 of the Civil Practice Act.

The complaint was filed on November 17, 1939, by the plaintiff appellee, Anthony Mousette (hereinafter called the plaintiff), alleging that more than two and a half years prior thereto, namely: On April 13, 1937, his son Peter had died, and that a policy of insurance issued by the defendant was then in force upon his life. The complaint states that the policy was dated March 3, 1937, and provided for the payment of $1,000 upon the death of Peter, plus an additional $1,000 should death be caused by accidental means. Plaintiff asserted that only $50 had been paid under the policy and that $1,950 remained due, and asked judgment for that sum, plus interest at 5 per cent.

The answer of the defendant denied the existence of the policy; denied liability; and affirmatively alleged: (1) The release of the plaintiff's claim; and (2) That Peter, the alleged insured, was of unsound health at the time the policy was delivered and the first pre-

mium thereon paid, contrary to a condition of the policy that no liability would exist thereunder "unless and until the policy be delivered, and the first premium thereon paid, during the lifetime and sound health of the applicant." The provision of the policy and the release were set out in full.

The plaintiff filed a reply and an additional reply denying that the assured was of unsound health at the time of delivery of the policy and payment of the initial premium, and asserting that even if he were, this fact was known to defendant at that time, and that defendant was estopped to make that defense; and further set up in said reply the charge of fraud in the execution and procurement of the releases, and asked that they be set aside and declared of no effect.

The facts in this case, in the main, are not in dispute. The evidence disclosed that Peter Mousette, the insured, who was referred to in the evidence as "Tony," was 23 years of age; that he lived at home with his father, the plaintiff in this case, and was employed at a manufacturing plant near East St. Louis. The evidence further disclosed that on February 24, 1937, H. H. Hoffman, an agent of the defendant, operating out of its East St. Louis office, employed by the defendant to take applications for insurance, collect premiums therefor, mail such applications to the defendant, and receive and deliver the policies issued pursuant thereto, took Tony's application for the policy of insurance here involved. The defendant, a Massachusetts corporation, issued the policy, but it was not delivered to the insured until April 8, 1937.

On April 2, 1937, Tony was involved in an automobile accident, as a result of which he received a cut about 3 inches long between the wrist and the elbow of his left arm. He was taken to Christian Welfare Hospital where the wound was sutured and his arm bandaged. The next day he consulted Doctor T. Van Boyd, who found that the arm was so badly swollen that he cut the

stitches to permit a draining of the wound. The doctor bandaged the arm from the elbow to the hand, and Tony visited the doctor's office on the 5th, 7th, 9th, and 10th of April for treatment. The evidence disclosed there was redness about the wound and the swelling persisted, and pus continued to drain from the wound. This, the doctor testified, was evidence that the arm was infected. The doctor testified, however, that he did not think the patient's condition was serious and so advised him, and was of the opinion that Tony could return to his work in a short time. On April 8, Tony went to the place of his employment to obtain his pay check, and shortly after he had returned home, at about 1:30 in the afternoon, the defendant's agent, Hoffman, and a Mr. Wessell came to the home. The evidence disclosed that Mr. Hoffman, seeing Tony's bandaged arm, at once inquired as to the cause thereof and he was told about the automobile accident, the visit to the hospital, and the treatment there, and that Tony was receiving daily treatments from Doctor Boyd. Tony told Mr. Hoffman that the doctor did not consider the injury as serious and had expressed the hope that he would soon be able to resume his employment. It appears from the evidence that the accident, injury, and the treatment thereof, were extensively discussed for approximately 20 minutes. Mr. Hoffman finally told Tony that he had a policy of insurance for him, and was advised by Tony that he had not as yet cashed his pay check, but would do so immediately. Tony then put his right arm into his coat sleeve, and threw the coat over his left shoulder because of the bandage on that arm, and accompanied by Mr. Hoffman and Mr. Wessell he went to a neighborhood grocery store, in Mr. Hoffman's automobile, where the pay check was cashed. They then returned to the Mousette home where Mr. Hoffman delivered the policy to Tony and received the premium. The policy bears date of March 3, 1937, and the premium paid at the time of

the delivery was for insurance coverage for a period of 3 months, beginning at the date of the policy.

The evidence further shows that on April 9, Doctor Boyd put a drain in the wound on Tony's arm, and on the next day Tony's condition became worse and a Doctor Nolden was called into the case. Tony was removed to the hospital and his arm amputated. The amputation and a blood transfusion were futile, and on April 13 Tony died as a result of a pyogenic infection caused by the accident.

The plaintiff testified that he was 51 years of age at the time of the trial, and had been employed as a laborer since he was 16 years of age, and that his education was confined to a few years attendance at a country school, and that he had had no previous experience with insurance policies or insurance company adjusters. Plaintiff further testified that shortly after Tony's death, he took the policy in question to the defendant's East St. Louis office and made claim thereon, and within a few days a Mr. E. E. Post, defendant's adjuster, came to the Mousette home. The evidence disclosed Mr. Post to be a university graduate, who had 9 years' experience in investigating and adjusting claims for insurance companies.

Mr. Post inquired of plaintiff concerning the accident and plaintiff told him that he was not in the car at the time and had no personal knowledge thereof. Mr. Post then took a complete written statement of facts concerning the accident and the circumstances relative to the delivery of the policy, from Tony's sister who was present when the policy was delivered. He visited the store where the pay check had been cashed and was apprised of all the facts relative thereto. He called upon Doctor Boyd and inquired of him as to the injury and treatment, and took a statement from Mr. Hoffman. He testified that Mr. Hoffman did not tell him that at the time the policy was delivered that Tony had made any representation that he was in good health.

It appears that after Mr. Post conferred with officials of the defendant Company, he returned to plaintiff's home on the evening of May 11, and at that time had with him a prepared release, and that he talked to plaintiff and his son-in-law Albin Sauerbrunn. The evidence disclosed that Mr. Post told the plaintiff that he was sorry but that he had "bad news" for him, and that, namely, the policy was no good because Tony had had an accident before the policy was delivered and the Company did not know about it. The evidence discloses that Mr. Mousette said at the time, "It is awfully funny they didn't know anything about it—the agent gave us the policy." Mr. Post said that even if that was true, the company was not responsible for what its agent did, and that after the matter had been discussed at some length, Mr. Post said that because of plaintiff's bad luck in the recent death of his wife and son, the Company, to show its appreciation, would give him $50 or $75, and that plaintiff said, in reply thereto, "If the policy is no good, I will keep it," but Mr. Post assured him that while it was of no value and would be of no use to him, the Company desired the policy for its records. Mr. Post told plaintiff that the $50 was a gift, and the plaintiff testified that he considered it as such.

It appears that the releases in question were not read or discussed at plaintiff's home, and that plaintiff's sight was bad, and he had no glasses to enable him to read, and, at plaintiff's suggestion, he, Mr. Post, and Mr. Sauerbrunn, went to see Mr. Button, a friend of the plaintiff, and that upon arrival there Mr. Post explained that the policy was void because the Company did not know of Tony's injury at the time it was delivered, and he pointed out the provision in the application that he claimed contained the language invalidating the policy. The type used in that clause was so small that Mr. Button testified he had to use a magnifying glass to read it. Mr. Post further stated that the policy was of no value because

Tony had met with an accident before it was delivered, and that the Company had no knowledge thereof, but that the Company was willing to pay plaintiff $50 and return the premium. This representation was made after statements had been taken from plaintiff's daughter, Mr. Hoffman, and Doctor Boyd. Mr. Post and Mr. Button testified that the releases were read aloud at Mr. Button's home, but the plaintiff and Mr. Sauerbrunn testified that they were neither read nor discussed, and plaintiff further testified that he did not at any time read or hear the releases read. After some discussion the parties went to a nearby notary public. Plaintiff testified that he was bewildered and that the recent death of his wife and son had so effected him that he lost interest in things and that it seemed that he was constantly beset with trouble. He further testified that he asked Mr. Post to give him a few days so that he might ask advice on the matter, but Mr. Post told him that in that event he would withdraw his offer and that plaintiff would get nothing.

Mr. Post and Mr. Button further testified that the releases were discussed and reread at the notary's home; and the notary testified that the releases were read, but not discussed; and the plaintiff and his son-in-law testified that they were neither read nor discussed. The releases, which appear in evidence as plaintiff's exhibits 3, 4, and 5, were signed by plaintiff and witnessed by the parties present, and Mr. Post handed the plaintiff a check for $57.17. The plaintiff testified that he accepted the payment as a gift, in accordance with Mr. Post's representations, and that he thought he had merely executed a receipt.

The court found that the policy was binding on the defendant, and that the defendant was estopped from asserting the contrary; that the releases were not a bar to plaintiff's suit; that they were the product of defendant's false and fraudulent misrepresentations

and conduct; that the defendant did not discharge its fixed obligation to the plaintiff of $2,000 by the payment of $50. The defendant was given credit for such payment and was ordered to pay plaintiff the balance, and interest thereon. This appeal follows.

It is very earnestly urged by the defendant herein that it should prevail in this case for the reason that the policy in question contained a provision that, ''No liability shall exist unless and until the policy hereby applied for shall be delivered and the first premium paid, during the lifetime and sound health of the applicant.'' This is a valid contention and constitutes a good defense to an action predicated on the policy where the facts warrant (*Union Bank of Chicago v. Metropolitan Life Ins. Co.*, 266 Ill. App. 345).

We find ourselves entirely in harmony with the law announced in the above-cited case, but we believe that that is not such a rule as but may be departed from in the proper case. An examination of the evidence in this case persuades us that the defendant's agent, Hoffman, had authority to take applications for insurance, and to take this application in question; and that he had authority to and did cause the application in question to be delivered to the defendant herein; and that he did have a right to and did receive and deliver the policy issued pursuant to such application; and that he collected the premium therefor; and that he was a general agent of the defendant herein and his knowledge of the injury in question was the knowledge of the defendant Company (*John Hancock Mut. Life Ins. Co. v. Schlink*, 175 Ill. 284; *Nieman v. Security Benefit Ass'n*, 350 Ill. 308).

We believe, and so hold that, there was a further liability on the defendant Company that if any length of time intervened between the date of the application and the delivery of the policy in question, that it was incumbent upon the defendant Company to make inquiry when the policy was delivered as to the condi-

tion of the health of the assured, and that if it failed so to do and made delivery of the policy in question that, that delivery is conclusive against the defendant as to the completion of the contract (*Hungate v. New York Life Ins. Co.*, 267 Ill. App. 257; *Crawford v. Abraham Lincoln Life Ins. Co.*, 278 Ill. App. 576).

And we further find that the evidence in this case fairly proves that the defendant Company, through its agent, with knowledge of assured's prior injury, delivered the policy and accepted the premium, and we hold that it cannot be heard to say that the policy is not a binding contract (*Beddow v. Hicks*, 303 Ill. App. 247).

There was a full and complete disclosure made by the assured of every fact within his knowledge concerning his injury and the treatment thereof, and in full possession of that knowledge the defendant Company expressed its desire to enter into the contract of insurance, and delivered its policy. We cannot believe that the law will now permit the defendant Company to escape the liability it contracted to assume (*Froehler v. North American Life Ins. Co. of Chicago*, 374 Ill. 17).

The defendant herein, after full and complete knowledge had been given to its agent by the assured, and after the Company's agent had stood in the presence of the assured, where it was plainly visible to everyone that the assured had an injury of some kind, character, or description, made delivery of the policy and collected the premium therefor, and we must conclude that the liability of the defendant herein on said policy is absolute, unless the contention advanced by the defendant herein that the release secured by another agent of the defendant herein, operates as a bar to plaintiff's suit. We now direct our attention to a consideration of that release.

It seems to us from a fair consideration of the facts and circumstances in evidence in connection with the procuring of said releases, that said facts and circum-

stances were such that a court of equity could, with perfect propriety, withhold giving approval thereto, and we do not feel that any further recital of the evidence than has already been set forth earlier in this opinion, is necessary to fully and completely sustain the action of the trial court in withholding approval of said releases.

This case was tried before the court, without a jury, and as a court of review, we will not substitute our findings of fact for the findings of fact of the trial court, unless the judgment is clearly against the manifest weight of the evidence (*Chamblin v. New York Life Ins. Co.*, 292 Ill. App. 532) ; and as a reviewing court, we will accept the findings of the chancellor upon questions of fact, based upon the statements of witnesses whom he saw and heard testify, unless such findings are clearly and palpably erroneous (*Kinnah v. Kinnah*, 184 Ill. 284).

We find that the judgment of the court is not against the manifest weight of the evidence, and that his findings are not clearly and palpably erroneous, but that such findings of fact are in harmony with the weight of the evidence, and not in any way erroneous.

The judgment of the trial court, being correct, is hereby affirmed.

*Judgment affirmed.*