EVELYN SEIDLER, Plaintiff-Appellant, *v.* GEORGETOWN LIFE INSURANCE CO., Defendant-Appellee.

First District (1st Division)    No. 78-2120

Opinion filed March 10, 1980.—Rehearing denied April 7, 1980.

Chapman and Royce, and Roan and Grossman, both of Chicago (Gene L. Armstrong, James P. Chapman, Edward T. Joyce, and William J. Harte, of counsel), for appellant.

Francis B. Libbe, of Kirkland and Ellis, of Chicago, for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

At stake in this appeal are the proceeds of an insurance policy for $1 million on the life of Jacob Grossman who died on November 15, 1973. Evelyn Seidler (plaintiff), beneficiary of said policy, brought this action against Georgetown Life Insurance Co. (Georgetown), the insurer. We are concerned only with count I of plaintiff's complaint involving policy No. 9130. Both plaintiff and defendant filed motions in the trial court for summary judgment on this count. The trial court denied plaintiff's motion and granted defendant's motion. Thereafter, the trial court denied plaintiff's motion to vacate the order granting summary judgment to defendant. The previous order denying plaintiff's motion for summary judgment was never vacated. Plaintiff appeals.

Certain of the facts are undisputed. On March 24, 1973, the deceased signed a policy application. This document provided:

"It is agreed: (1) the Company shall incur no liability under this application until it has been received and approved, a policy has been issued and delivered, and the full first premium specified in the policy has been actually paid to and accepted by the Company while health, habits and occupation of the Proposed Insured remain as described in this application in which case the policy shall be deemed to have taken effect as of the date on which the policy was signed."

In preparing the application, deceased was assisted by Harold Gaffney. Defendant's brief describes Gaffney as the insurance agent of the deceased. Plaintiff's brief describes Gaffney as a broker for Georgetown.

A $20,000 portion of the policy was to be underwritten by Georgetown. The remaining $980,000 was reinsured by Republic National Life Insurance Company. In this situation, Georgetown would obtain the necessary information from the policy applicant. Republic would evaluate the situation and determine the premium rating to be applied to the applicant.

A medical consultant for Republic, Dr. Charles H. Lodowski, evaluated the risk. His deposition reflects that he examined the pertinent information in April of 1973. He noted the deceased had an elevated blood cholesterol level to an abnormal extent; evidence of lung calcification and a questionable life expectancy as indicated by family mortality. The mother of the deceased had died of cardiovascular disease at age 57. The father died of a stroke at age 69. This meant that, as a matter of statistics, the deceased would be classified as a person susceptible to occlusive vascular disease.

The evaluating doctor also noted the deceased was on a restricted diet and had been taking drugs in an effort to remedy the cholesterol condition. The physician also examined an X ray of the lungs and an electrocardiogram taken at the Mayo Clinic in January of 1972. The doctor found a defect in the integrity of the lung and an irregularity in the cardiogram. He considered these two findings to be medically related. The doctor concluded that the right auricle of the heart was thickened and overworked by the difficulty of supplying blood to the calcified portions of the lung.

Another X ray taken February 1972 indicated to the doctor that the calcification in the lung had progressed to the extent that scarring had begun. The doctor also had an evaluation by another physician in connection with an electrocardiogram submitted to another insurance company and medically evaluated by that company in December of 1972. This data suggested possibility of arterial enlargement, emphysema or pulmonary disease. The doctor further considered a so-called M.I.B.

code prepared by an association of life insurance companies. This indicated another physician had suspected that the deceased was afflicted with arteriosclerosis.

Based upon this information, Dr. Lodowski concluded the deceased probably had a compromised life expectancy. In the opinion of the doctor, this conclusion was linked to the probability of arteriosclerosis and the possibility of heart disease. For these reasons Republic gave the deceased a Table 2 rating. At that time, the deceased at age 38 would have an average life expectancy of 29.76 years. A person of standard or ordinary risk at age 38 would have a life expectancy of 33.97 years.

Approximately 10 days after the insurance application, the deceased was admitted to a hospital in Bloomington, Illinois. The treating physician, Dr. Seymour Goldberg, diagnosed his problem as "spastic colitis, anxiety neurosis and fatigue syndrome." He was given medication and was shortly discharged from the hospital.

About one month after signing the insurance application, the deceased became a patient in the Intensive Care Unit of a hospital in Billings, Montana. The treating physician, Dr. Ross Lemire, diagnosed the condition as "a heart attack." He so advised the patient. The doctor testified that in his opinion the deceased had "suffered an anterior septal myocardial infarction acute" several days previously.

In his deposition, Dr. Lemire also stated that about 10 years previously, when the deceased was 28 years old, he had sustained a heart injury and was hospitalized. He was given an anticoagulant. At that time, this was regular medical procedure where a suspected heart attack was concerned. This episode of 10 years previously had been noted by the deceased in the insurance application. The doctor also testified the deceased had normal blood pressure and there was no evident abnormality in the heart tone. An electrocardiogram taken at the time was "definitely abnormal" but was "borderline." The doctor compared this cardiogram to later cardiograms. His diagnosis was that the deceased suffered from arteriosclerotic heart disease with coronary insufficiency which caused a small septal myocardial infarction. The deceased received no medication beyond bed rest.

Subsequent to this hospitalization, deceased returned to Bloomington. His physician there was Dr. Edgar Stevenson. The doctor prescribed a medication to dilate constricted blood vessels. Deceased complained to Dr. Stevenson of tightness in the chest but not pain. Dr. Stevenson expressed the opinion that deceased could recover to lead a normal life and would have a "practical and normal life expectancy." While hospitalized in Montana, the deceased had spoken to Dr. Stevenson on the telephone. Deceased said he did not want people in his community to know about his Montana hospitalization. Deceased said he preferred

that people would think he was injured in a skiing accident. While being treated by Dr. Stevenson, the deceased remained active to the point of playing tennis.

On June 21, 1973, Harold Gaffney personally delivered the insurance policy to the deceased. He did not remember if he had spoken to the deceased at that time concerning the change of health clause in the application above quoted. Gaffney could not remember if the deceased read the policy upon delivery or read the application before signing it. He did discuss the rated premium with deceased. The application for the policy was not in possession of deceased during the pendency of the application prior to delivery of the policy. Georgetown did not request Gaffney to make any inquiry to the deceased regarding health condition upon delivery of the policy.

The deceased came to his death on November 15, 1973. Dr. Stevenson signed the death certificate. Cause of death was stated as a coronary occlusion and acute heart failure.

Plaintiff contends genuine issues of material fact exist which require determination by a jury. These issues are: decedent's myocardial infarction was a manifestation of a disease existing prior to the application for insurance; defendant knew of the existence of this disease; and defendant should be estopped from avoiding the policy. Plaintiff further contends that where, as here, an applicant has submitted to a physical examination, and the application contains a "change in health" provision, the failure of the insurer to inquire as to the applicant's health at the time of delivery results in delivery being conclusive against the insurer as to the existence of the contract.

In our opinion, plaintiff's last contention does have merit. In *Hungate v. New York Life Insurance Co.* (1932), 267 Ill. App. 257, 260, the policy contained a change in health clause. No inquiry was made by the insurer prior to delivery of the policy. The court stated:

> "It has been held that if any length of time elapses between the making of the application and the issuing of the policy, it is the duty of the insurer to make inquiry when the policy is delivered as to the condition of the health of the insured, and if it fails to do so the delivery is conclusive against the insurer as to the completion of the contract." 267 Ill. App. 257, 260.

Subsequent cases in which the insurance policies also had good health clauses have relied upon *Hungate* to establish the duty of an insurer to inquire as to the health of the insured. These cases hold the policy valid in event of lack of such inquiry: *Stramaglia v. Conservative Life Insurance Co.* (1943), 319 Ill. App. 20, 48 N.E.2d 719; *Mousette v. Monarch Life Insurance Co.* (1941), 309 Ill. App. 224, 32 N.E.2d 1004; *Crawford v. Abraham Lincoln Life Insurance Co.* (1934), 278 Ill. App.

576; and *James v. National Life & Accident Insurance Co.* (1932), 265 Ill. App. 436. The above cases, although not recent, have never, to our knowledge, been overruled.

In this regard we note the practice of Republic to require the completion of a special form by the applicant at delivery of the policy indicating whether there has been a change in health. This practice is followed where the policy is delivered 90 days or more after the application date. Defendant Georgetown's policy forms which were utilized here, do not include this requirement. Ninety days elapsed in the case at bar from the date of application to delivery of the policy. During this time the decedent did not retain possession of a copy of the application. We find that the defendant failed in its legal duty to inquire as to the applicant's health at the time of delivery of the policy. However, this determination alone is not dispositive of this case.

Defendant contends, and we agree, that good faith regarding disclosure is demanded of the parties to an insurance contract. In *Stipcich v. Metropolitan Life Insurance Co.* (1928), 277 U.S. 311, 317, 72 L. Ed. 895, 898, 48 S. Ct. 512, 513-14, the United States Supreme Court declared:

> "If, while the company deliberates, he [the applicant] discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy, [citations], or if a policy has been issued, it has a valid defense to a suit upon it."

Shortly thereafter, the Illinois Supreme Court followed *Stipcich*. In *Western & Southern Life Insurance Co. v. Tomasun* (1934), 358 Ill. 496, 502, 193 N.E. 451, the court stated:

> " 'The law is well settled, in its application to insurance contracts, that a misrepresentation of a material fact, in reliance upon which a contract of insurance is issued, will avoid the contract * * *. * * * .' "

The *Tomasun* court (358 Ill. 496, 503) quoted *Stipcich* and reasoned:
> " '[E]ven the most unsophisticated person must know that in answering the questionnaire and submitting it to the insurer he is furnishing the data on the basis of which the company will decide whether by issuing a policy it wishes to insure him.' "

In our opinion the results reached were quite appropriate to the facts in *Stipcich* and *Tomasun*. In *Stipcich*, the decedent's condition of a duodenal ulcer was unknown at the time of making of the application, and there was no physical examination prior to delivery of the policy. As the only possible source of this most material information, the deceased

was obligated, in the spirit of fair dealing, to inform the company of a recurrence of the ulcer. In *Tomasun*, the deceased certified to the insurer's physician and on the application that she was then in good health and had no surgery, no disease of the reproductive organs, and no cancer. Her answers were false. She had undergone cancer-related surgery six months prior to the application and was operated on for cancer twice more before her death. One of these operations occurred the day after she signed her application. By fraudulent misrepresentation of such material facts, the deceased violated all equitable rules of good faith.

In similar cases relied upon by the defendant, the courts have held that when an applicant makes a material misrepresentation in the application, a good-faith duty on his part arises to inform the insurance company so that it may appraise the unanticipated increased risk. *Apolskis v. Concord Life Insurance Co.* (7th Cir. 1971), 445 F.2d 31, misrepresentation on application of organic heart disease; *Jessen v. Aetna Life Ins. Co.* (7th Cir. 1954), 209 F.2d 453, misrepresentation on application of heart condition and diagnosis of future coronary occlusion; *Carroll v. Preferred Risk Insurance Co.* (1966), 34 Ill. 2d 310, 215 N.E.2d 801, loss of automobile insured by predated policy; *Campbell v. Prudential Insurance Co. of America* (1958), 15 Ill. 2d 308, 155 N.E.2d 9, misrepresentation on application of ulcer, and surgery, even though death resulted from an unrelated affliction; *Metropolitan Life Insurance Co. v. Moravec* (1905), 214 Ill. 186, 73 N.E. 415, application misrepresentation of permanent organic heart disease; and *Unger v. Metropolitan Life Insurance Co.* (1968), 103 Ill. App. 2d 150, 242 N.E.2d 907, misrepresentation on application of psychiatric visits and whiplash injury.

However, in the case before us, the deceased made no material misrepresentation on his application for insurance. On the contrary, he provided extensive medical records to Dr. Lodowski, Medical Consultant-Underwriter to Republic. In assigning the increased rate of mortality, Dr. Lodowski was able to evaluate records of prior physical examinations, lung X rays, electrocardiograms, diet and medication prescribed for decedent and also his family history. The doctor was also able to rely upon available evaluations by another insurance company and by a confidential association of insurance underwriters. The truthfulness and extensive cooperation by decedent at the time of application allowed the defendant clear opportunity intelligently to evaluate the risk then involved, as required by *Tomasun* (358 Ill. 496, 503). In fact, on the basis of information this furnished, defendant was fully aware of the "compromised life expectancy" of the decedent and accordingly increased his premium 50 percent above normal.

■■ For these reasons we are unable to dispose of this case by application of the principle of law thus advanced by defendant. Instead, we find that

any determination of the rights of these parties must of necessity define the condition which defendant contends the decedent failed to disclose. Both sides of the controversy before us agree that if, during the time between the application and the delivery, the applicant "contracts sickness or disease from which he was not suffering at the time of his application, and which is material to the risk involved" without disclosing this fact to the insurer, the contract does not become effective. (*Kroon v. Traveler's Insurance Co.* (1937), 290 Ill. App. 35, 40, 7 N.E.2d 935.) In *Kroon*, the applicant failed to disclose his developing tonsilitus and sinusitus which were contributing causes to death by pneumonia. (See *Kroon*, 290 Ill. App. 35, 37.) Similar conditions prevailed in *Tomasun*, 358 Ill. 496, 502-03, and *Stramaglia*, 319 Ill. App. 20.

Therefore in the instant case, if the myocardial infarction suffered by decedent during the pendency of his insurance application was a newly apparent change in the condition of his health, the decedent had a legal as well as a contractual obligation of disclosure to the defendant. If, on the other hand, the myocardial infarction was not a newly contracted disease, but simply a manifestation of a preexisting heart disease, the decedent fulfilled his duty of disclosure and good faith by his truthful and cooperative actions at the time of application.

██ This is illustrated by *James*, 265 Ill. App. 436, 439, where the court held that a change in health provision "does not apply to the condition that existed prior to and at the time of the making of the application. If a condition so existing is relied upon as a defense it must be based upon some other provision of the insurance contract."

The *James* court found a valid insurance contract existed even though at the time of application the applicant unknowingly had tuberculosis, the cause of her subsequent death. See also *Mousette*, 309 Ill. App. 224, knowledge of applicant's prior car injury was also binding; *Crawford*, 278 Ill. App. 576, brain tumor unknown at application; and *Hungate*, 267 Ill. App. 257, "well developed tumor" existing prior to the application.

This crucial distinction of fact is also highlighted by *Jacobson v. Equitable Life Assurance Society* (7th Cir. 1967), 381 F.2d 955. Deceased was rated in a higher premium group because of known high blood pressure. After the application but prior to delivery of the policy, decedent underwent successful surgery for blockage of a blood vessel to his leg, but failed to disclose this to the insurance company. (*Jacobson*, 381 F.2d 955, 958, quoting *Stipcich*, 277 U.S. 311, 316-17, 72 L. Ed. 895, 898, 48 S. Ct. 512, 513.) He subsequently died from a coronary occlusion unrelated to the surgery, except for the fact that both arose from general arteriosclerosis. The policy beneficiaries contended that the increased premium was sufficiently compensatory for the increased risk from

arteriosclerosis. However, the Court of Appeals reasoned that the fatal defect in plaintiffs' argument was the lack of a known causal relationship between high blood pressure and general arteriosclerosis. In the case before us, plaintiff urges the existence of a strong causal relationship between general arteriosclerosis and myocardial infarctions.

■ In our opinion, the distinction between a newly contracted disease as opposed to the maturation of a preexisting illness is a question of fact requiring expert testimony. In *Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 98-99, 382 N.E.2d 1201, quoting *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516, 211 N.E.2d 733, the court held:

> " '[T]he trend is to permit expert testimony in matters which are complicated and outside the knowledge or understanding of the average person, and even as to matters of common knowledge and understanding where difficult of comprehension and explanation.' "

This necessary determination requires a knowledge and application of principles of medicine far beyond the ability of either this court or the trier of fact.

We therefore have carefully reviewed the depositions of the physicians presented by the parties prior to the granting of summary judgment. Dr. Lodowski testified he considered the right atrium of the heart to be thickened, enlarged, and overworked while delivering blood to the lung with increased pressure. After multifactored evaluation, he concluded the decedent had a "compromised life expectancy" since he would develop "probably arteriosclerosis, possibly heart disease." At the same time, as above shown, Dr. Lodowski considered additional information which indicated another physician had suspected already existing arteriosclerosis. Furthermore, Dr. Lodowski stated that the elevated cholesterol of the decedent statistically at least would make him more susceptible to occlusive vascular disease including myocardial infarction.

The deposition of Dr. Lemire, diagnosing and treating physician in Montana, is also relevant here. He testified that if a person has a heart attack, the physician usually presupposes underlying heart disease symptoms. The symptoms Dr. Lemire suggested were those known to or suspected by Dr. Lodowski, including coronary artery disease, coronary atherosclerosis, thickening of the vessel wall, and narrowing of the lumen.

However, in our opinion, the expert opinions presented in the depositions are insufficient to allow this court to determine the disputed material fact of when the fatal disease originated. It follows that the summary judgment for defendant is not justified by the record before us.

In *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 393, 349 N.E.2d 1, the court said:

"A motion for summary judgment will be granted if the pleadings, depositions, admissions and affidavits on file reveal that there is no genuine issue as to any material fact and that the movant is entitled to a judgment or decree as a matter of law. (Ill. Rev. Stat. 1975, ch. 110, par. 57(3); *Carruthers v. B. C. Christopher & Co.*, 57 Ill. 2d 376.) A reviewing court must reverse an order granting summary judgment if it is determined that a material question of fact does exist."

■■ The summary judgment in favor of defendant is accordingly reversed and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed and cause remanded.

McGLOON and CAMPBELL, JJ., concur.