MASSACHUSETTS MUTUAL LIFE IN-SURANCE COMPANY, a Massachusetts Corporation, Plaintiff–Appellant,

v.

Patricia O'BRIEN and Colleen C. O'Brien, Defendants–Appellees.

No. 92–3937.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1993.

Decided Sept. 29, 1993.

---

David B. Mueller (argued), Cassidy & Mueller, Peoria, IL, for plaintiff-appellant.

George J. Lewis, Lewis, Blickhan, Longlett & Timmerwilke, Mark A. Drummond (argued), Schmiedeskamp, Robertson, Neu & Mitchell, Quincy, IL, defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.*

FLAUM, Circuit Judge.

In this case, an insurance company appeals from the entry of summary judgment against it and from the award of attorney fees and a penalty to the defendants. We vacate both the entry of judgment and the award.

I.

On August 2, 1988, Janell Farmer, an agent for Massachusetts Mutual Life Insurance Company (Mass Mutual), mailed a prospect letter to Sean P. O'Brien. Three weeks later, the two met in Farmer's office to discuss life insurance policies. O'Brien said that he was in the market for insurance, but was worried that he would have to pay higher premiums because he had been treated for Hodgkin's disease, a cancer of the lymphatic system, while a child. He explained that he was diagnosed with the disease in 1977, and received chemotherapy and radiation treatment through February and April of 1978. Farmer suggested that O'Brien complete a survey form so that Mass Mutual could consider his medical history for a $50,000 policy.

On October 18, the Mass Mutual underwriter informed Farmer that O'Brien's policy was tentatively approved subject to an application and medical examination. Two days later, he and Farmer met and filled out forms. O'Brien completed applications for $50,000 of universal life insurance and $100,-000 of term life insurance. Following a physical examination by Dr. Roy T. Rapp, both applications were forwarded to the company. On December 10, they were approved and

---

* The Honorable Hubert L. Will of the Northern District of Illinois, sitting by designation.

received by Farmer, who made an appointment with O'Brien and his fiancee (later his wife) to "deliver" the policies.

On December 15, O'Brien accepted the $50,000 policy, paid the first premium, and requested that it be changed from universal to ordinary life. At the same time, despite Farmer's encouragement, he refused delivery of the $100,000 term life policy and did not pay the $39 premium. On December 20, Farmer decided to pay the $39 premium on her own by charging it against commissions due to her husband, another Mass Mutual agent. She later admitted that she did so, without O'Brien's knowledge, because "I felt very strongly that he should have an extra $100,000 because of his medical history," and prepaying the premium "would make it easier to deliver the policy and have him accept it and make payment to the policy." That same day, O'Brien underwent a lumbar MRI at St. Mary's Hospital in Quincy, Illinois, because he had been experiencing back pain, which he mentioned on his application and verbally to Farmer. The test disclosed a tumorous mass in the area of the second lumbar vertebra. On December 26, he underwent investigative surgery, and doctors discovered a chondroblastic grade 3 osteosarcoma. Further tests were performed in early January, 1989, at Barnes Hospital in St. Louis.

Unsurprisingly, O'Brien changed his mind about the second policy. On January 21, 1989, he and his fiancee met Farmer at his mother's house in Quincy. O'Brien signed a form called a conditional receipt and his fiancee wrote a check to Mass Mutual for $39.82. He did not reveal the medical developments that had taken place in December and January. Not until March, 1989, did Farmer learn that O'Brien was diagnosed with cancer. On July 12, 1989, he died as a consequence of a pulmonary embolism caused by osteosarcoma of the spine.

Mass Mutual paid the death benefit on the $50,000 policy to the beneficiaries, Sean O'Brien's widow Colleen O'Brien and his mother Patricia O'Brien (collectively, the O'Briens). While investigating the claim, however, it learned that Sean O'Brien had undergone tests and surgery in December before taking delivery of the $100,000 policy without disclosing those activities to the company. Mass Mutual thereafter returned the quarterly premiums and filed for a declaratory judgment regarding its rights and obligations under the policy. The O'Briens counterclaimed, eventually winning the case on summary judgment. This appeal followed.

## II.

To determine the rights and obligations of the contracting parties, we begin with the policy application itself. It states, in pertinent part:

**Liability of Company.** The insurance or annuity applied for will not take effect unless each of the applicable conditions is met:

. . . . .

II. *For Other Life or Disability Insurance or a Rider on an Annuity.* For any other life or disability insurance applied for . . . the first premium . . . may be paid to the Company's agent in exchange for a conditional Receipt signed by that agent. If this is done, the Company shall be liable only as set forth in that Receipt. If the premium . . . is . . . not paid, the Company shall have no liability unless and until:

* The application has been approved by the Company at its home office; and

* The first premium . . . has . . . been paid during the lifetime of all persons to be insured by the policy . . . ; and

* The policy . . . has been delivered to the person named as owner therein; and

* At the time of payment and delivery, all statements in the application which relate to the insurability of the Proposed Insured are complete and true as though they were made at that time.

It is the last of these four conditions that apparently went unsatisfied.

Part 2 of the application required that Sean O'Brien answer a series of specific questions about his medical history by checking "Yes" or "No" boxes. For any question answered "Yes", the application instructed him to "giv[e] particulars" in a large blank

space on the form, including for medical histories the "nature of ailment, date, duration and attending physicians." Question 4 asked whether he had ever been advised of or treated for a list of conditions and disorders. Part J of that question inquired about any "cancer, tumor, cyst, or disorder of the skin or lymph glands." O'Brien checked the "Yes" box and wrote "Hodgkin's." He also drew an arrow pointing to the blank space, and wrote:

> June, July, Aug—1977 Diagnosis & Rx (chemo) Hodgkin's Feb & April 1978—Radiation Rx—Barnes Hosp. St. Louis Mo. Edward Reinhart, M.D.

Question 7 asked: "Other than above, within the past five years have you: (A.) Had any mental or physical disorder? (B.) Had a checkup, consultation, illness, injury, surgery? (C.) Been a patient in a hospital, clinic, sanatorium, or other medical facility? (D.) Had electrocardiogram, x-ray, other diagnostic tests? (E.) Been advised to have any diagnostic tests, hospitalization, or surgery which was not completed?" Next to each part, O'Brien checked "No." Question 9 asked: "Are you now under treatment or taking any medication?" O'Brien checked "Yes" and wrote "See below." In the blank space, he added:

> after lifting developed back strain (3 days ago) L–S–Spine x-ray today & will have IVP Sat 10–22–88 Dr. Ali Rx Motrin 800 mg BID and Cyprofloxin BID, to be sure was not kidney infection.
> States he "feels fine" works every day— (Back is much better today.) [1]

Finally, question 10 asked: "Are you now planning to seek medical advice or treatment?" O'Brien checked the "No" box.

Many of these answers were no longer true by the time the second policy was delivered on January 21, 1989. By then he had been hospitalized, undergone an MRI and surgery, and been diagnosed with bone cancer. Hence, each of the subparts of question 7, relating to disorders, consultations, diagnostic tests, and so on, should have been answered "Yes." Question 10, which asked whether he was seeking medical advice or

treatment, should also have been answered in the affirmative. Moreover, Sean O'Brien's more detailed responses to question 4(J) (cancers or tumors) and question 9 (treatment and medication) were no longer complete and accurate, since they made no reference to the events of December and January.

▪ Against this substantial evidence to the contrary, the district court concluded that there was no misrepresentation on the forms even as of January 21, 1989. The court held that the decedent truthfully answered Question 4(J), because he indicated that he *did* have cancer—"Hodgkin's". Regarding Question 7, the court observed that the question began with the phrase: "Other than above, within the past five years have you. . . ." The court reasoned that the decedent's December diagnosis and treatment were associated with cancer, so that as of January 21, 1989, he had no medical disorders "other than" the cancer he listed above.

We are unable to accept this analysis for several reasons. The court apparently believed that "cancer is cancer"; it felt that when O'Brien notified Mass Mutual that he had suffered from Hodgkin's disease, he put the company sufficiently on notice that he might develop other forms of cancer. But the decedent's own internist, Dr. Zakiah Ali, rejected that theory. When asked whether Hodgkin's disease could metastasize into osteosarcoma, he answered: "No. Osteosarcoma is a totally different entity." The O'Briens point to no medical evidence on the other side. Furthermore, even if the wording of the application questions led the decedent to believe that some of his "Yes"/"No" answers continued to be accurate, the longer hand-written answers were obviously incomplete as of the date of delivery. A description of the decedent's treatment for Hodgkin's disease in 1977 and 1978 did not adequately "give particulars" about the surgery he had undergone in December, 1988. Finally, some questions such as number 10 ("Are you now under treatment or taking any medication?"), no matter how they might be construed, simply ceased to be answered cor-

---

1. The reference to "he" suggests that someone other than O'Brien may have written some of the answers on the form. O'Brien, however, signed it.

rectly after he sought care at St. Mary's and Barnes Hospitals.

In any event, this word-by-word parsing of the application questions partly misses the point about an applicant's duty of disclosure to his insurer. The reason why an insurance company includes a "change of health" clause in a personal insurance application is to help ensure that it will know whether the applicant's health has changed during the few weeks that intervene between the date of his physical and his payment of the first premium. It is beyond doubt that such an insurer expects to be informed that the applicant has undergone major testing and surgery in the meantime. The Supreme Court stated more than sixty years ago that insurance policies are traditionally considered contracts "uberrimae fidei"—in the most abundant good faith—meaning that they require complete disclosure by the applicant of all material facts involving his medical condition. The Court explained:

> Concededly, the modern practice of requiring the applicant for life insurance to answer questions prepared by the insurer has relaxed this rule to some extent, since information not asked for is presumably deemed immaterial.... But the reason for the rule still obtains, and with added force, as to changes materially affecting the risk which come to the knowledge of the insured after the application and before the delivery of the policy. For even the most unsophisticated person must know that, in answering the questionnaire and submitting it to the insurer, he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy.

*Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316–17, 48 S.Ct. 512, 513–14, 72 L.Ed. 895 (1928) (citations omitted). The Illinois courts have followed *Stipcich*. *See*

*Western & Southern Life Ins. Co. v. Tomasun*, 358 Ill. 496, 193 N.E. 451, 453 (1934); *Carroll v. Preferred Risk Ins. Co.*, 34 Ill.2d 310, 215 N.E.2d 801, 802 (1966) (material change in accident record); *see also Jacobson v. Equitable Life Assurance Soc'y*, 381 F.2d 955, 958–59 (7th Cir.1967) (applying Illinois law).

The O'Briens observe, however, that there is a conflicting line of cases that impose a duty on an insurer to inquire as to an applicant's health at the time the policy is delivered. *See Seidler v. Georgetown Life Ins. Co.*, 82 Ill.App.3d 361, 37 Ill.Dec. 664, 402 N.E.2d 666 (1st Dist.1980); *Hungate v. New York Life Ins. Co.*, 267 Ill.App. 257 (4th Dist.1932). In *Seidler*, the applicant for insurance provided information about his heart trouble so that the company could determine his premium rating. Between the time he submitted his application and the date of delivery, he suffered a heart attack and was hospitalized. He did not notify the insurance company, despite the fact that the application contained a "change of health" clause, and died some six months later of a coronary occlusion and acute heart failure. The court recognized that the applicant had a duty to disclose all pertinent medical information under the *Stipcich* principle, but it also held that the company should have asked again about his health prior to delivery. Which duty outweighed the other, the court held, depended on whether the undisclosed myocardial infarction was a "newly contracted disease, ... [or] simply a manifestation of a pre-existing heart disease." *Seidler*, 402 N.E.2d at 671. If the former, then the insured had a legal as well as a contractual obligation to disclose the fact to the company. If the latter, then the insured satisfied his obligation and the duty was upon the company to inquire at the time of delivery to ascertain whether his health had changed. How to categorize a disorder, the court held, is a question of fact that requires expert testimony. *See id.* at 672.

In this case, the *Seidler/Hungate* principle did not override the decedent's obligation to inform Mass Mutual about his December hospitalization and treatment. First, as we mentioned above, the O'Briens submitted no

evidence that the decedent's osteosarcoma was just a manifestation of his pre-existing Hodgkin's disease; his own physician believed the opposite. Moreover, later cases have clarified that there must be a close relationship between the original disclosed condition and the intervening, undisclosed illness: the first must put the insurer "on notice" of the second. *See Northern Life Ins. Co. v. Ippolito Real Estate Partnership,* 234 Ill.App.3d 792, 176 Ill.Dec. 75, 81, 601 N.E.2d 773, 779 (1st Dist.1992) (disclosure that applicant was hemophilic did not put insurer on notice that he also had AIDS). Second, it appears that Mass Mutual *did* inquire whether there had been any changes in the decedent's health. On the day the policy was delivered and Sean O'Brien wrote his first premium check, Farmer gave him a form called a conditional receipt. Under a heading that announced "Conditions That Must Be Met Before Any Insurance Becomes Effective," paragraph 4 of the conditional receipt stated:

> On the date of this receipt, all answers and statements in any part of the application having an earlier date are complete and true as though given on the date of this receipt.

It added that "[i]f any of these conditions is not met, the insurance shall not take effect. Then, this receipt will terminate and our only liability will be to return the payment made." The decedent signed the form.

The O'Briens offer two responses to the second argument. They maintain that, technically, the correct form to use when the premium is paid after the application is submitted but before delivery occurs is a "statement of insurability," not a conditional receipt. Hence, the conditional receipt has no legal force. They also contend that under the rules stated in the policy, Mass Mutual can contest the validity of the policy only for misrepresentations of fact that have been made in the application. Since these misrepresentations were made in the conditional receipt, they claim Mass Mutual cannot contest the policy.[2]

These responses misconceive the significance of the conditional receipt. Paragraph 4 of the receipt shows that Mass Mutual did inquire and that O'Brien did not disclose the changes in his health that had occurred during the pendency of his application. The misrepresentations in the receipt are not the reason Mass Mutual contests liability. Rather, the company denies coverage because the representations contained in the original application did not continue to be complete and true at the time of delivery and payment. The continuing validity of those representations was a condition precedent to the enforceability of the policy.

Next, the O'Briens advance a series of arguments to show that Mass Mutual waived its right to deny coverage. All depend on assertions that Farmer knew at one time or another that the decedent had undergone surgery. First, the O'Briens rely on deposition testimony from Colleen O'Brien that the decedent told Farmer before January 21, 1989, that the surgery had been performed. The trouble is that this testimony is plainly hearsay: it relies on what the decedent told Colleen O'Brien. Second, they point out that Farmer admitted in a letter that by February 16, 1989, she knew that the decedent "had been going to St. Louis for tests and had been in the hospital." But the letter is ambiguous as to *which* tests and hospitalizations Farmer knew about—ones occurring before January 21, 1989, or afterward. If the O'Briens could show that Farmer knew that the decedent had been diagnosed and treated before delivery, their waiver argument might be successful. For although the contract contained pertinent disclaimers (for example, "[n]o agent can

---

2. They also argue that the decedent informed Mass Mutual and Farmer long before the date of delivery (indeed, on the application form itself) about the backache that he was then suffering. The O'Briens maintain that osteosarcoma caused that pain, so that the tumor "was not a newly contracted disease, but simply a manifestation of a preexisting" condition that the decedent fully disclosed. This argument may have merit, but it

seems highly unlikely that disclosure of a backache would put an insurer "on notice" that an applicant was suffering from bone cancer. *See Ippolito,* 176 Ill.Dec. at 81, 601 N.E.2d at 779 (hemophilia does not put insurer on notice of AIDS). Moreover, the argument would still fail if the reaffirmations on the conditional receipt count as an inquiry conducted at the time of delivery.

waive any of the Company's rights or requirements, or extend the time for any payment"), there is caselaw to the effect that even disclaimers can be waived by an agent of an insurance company who has actual knowledge of the applicant's health. *See, e.g., Guter v. Security Benefit Ass'n,* 335 Ill. 174, 166 N.E. 521, 523 (1929); *New York Life Ins. Co. v. Chapman,* 132 F.2d 688, 693 (8th Cir.) (applying Illinois law), *cert. denied,* 319 U.S. 749, 63 S.Ct. 1158, 87 L.Ed. 1704 (1943). We express no view about the merits of such an argument, however, because the district court has not yet made any factual determinations on the matter.

█ The O'Briens' final argument is, unfortunately, one they failed to raise in their brief. In supplemental briefing, counsel for the O'Briens explains that the argument was raised before the district court, but inadvertently omitted on appeal. We will discuss the point although it has been waived. The O'Briens contend that the insurance contract went into effect when Mass Mutual approved the application and Farmer sua sponte credited the initial premium against her husband's account. The fact that the decedent did not pay until later, they argue, is irrelevant; delivery of the policy to Farmer constituted delivery to O'Brien. In support of this theory, the O'Briens cite the following passage from a leading treatise on insurance law, which in turn quotes several Illinois cases from the early part of this century:

> Where, however, there is no condition precedent to be performed before delivery and the policy is sent unconditionally to the company's agent to deliver the contract to the insured, the possession of the agent is that of the insured and no actual, manual delivery is necessary to bind the insurer on the risk.

1 John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 134, at 450 (rev. ed. 1981).

The defect in this theory is that Mass Mutual's policy *did* have conditions precedent to be performed before delivery and the policy was *not* sent unconditionally to Mass Mutual's agent. The application stated two explicit conditions: the policy had to be "delivered to the person named as owner therein," and all statements made in the application which related to the insurability of the applicant had to be "complete and true as though they were made at [the] time" of delivery and payment. In fact, the treatise cited by the O'Briens states elsewhere:

> [T]he delivery of an insurance policy is not effected by a transmission of the policy to the insurer's agent under instructions to turn over the policy to the insured only after compliance with certain conditions, such as that the applicant shall be in good health at the time, or that the premium shall be paid.

*Id.* § 134, at 447. And again:

> It is ... valid for the parties to stipulate in the contract that the policy shall not come into force and effect until delivery thereof, and in such event delivery is a necessary condition precedent to liability.

*Id.* § 133, at 445–46.

█ In addition to granting summary judgment for the O'Briens, the district court awarded them attorney fees and imposed a penalty of $25,000—the maximum allowable under the statute—on Mass Mutual for bad faith refusal to pay the insurance claim. *See* Ill.Rev.Stat. ch. 73, ¶ 767 (1991). Rather than evading its duties, we conclude that the company was acting within its rights to contest its liability in light of the decedent's apparent concealment of material facts about his health. We find no bad faith.

The entry of summary judgment is VACATED. The award of attorney fees and the imposition of the $25,000 penalty is VACATED. The case is REMANDED for further proceedings consistent with this opinion.