NORTHERN LIFE INSURANCE COMPANY, Plaintiff-Appellee, v. IPPO-LITO REAL ESTATE PARTNERSHIP *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—90—3316

Opinion filed January 14, 1992.

793

Donald L. Johnson and Steven R. Hansen, both of Chicago, and George T. Drost, of Arlington Heights, for appellants.

Peterson & Ross, of Chicago (J. Robert Geiman, David J. Novotny, and Donald A. Murday, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:
Plaintiff Northern Life Insurance Company (Northern Life) brought suit to rescind six life insurance policies issued to John Ippo-

lito on the ground that he had materially misrepresented the condition of his health when applying for the insurance. Defendants Ippolito Real Estate Partnership, Ippolito Beauty Academy, Inc., and International Beauty Systems, Inc., beneficiaries of the six policies, counterclaimed, seeking the proceeds of the policies. The circuit court granted Northern Life's motion for summary judgment as to the sixth policy, but denied summary judgment as to the first five policies. Defendants appeal the court's order entering summary judgment, made final and appealable pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)), raising in issue whether the circuit court erred in granting summary judgment on the sixth insurance policy in Northern Life's favor.

Sometime in 1982, both John Ippolito and his brother Rosario obtained life insurance policies from Northern Life. Should one of the Ippolito brothers die, it was planned that the proceeds from the policies were to be used to fund certain stock repurchase agreements they had instituted for each of the businesses they owned. Thus, the businesses owned by the brothers were named beneficiaries of the life insurance policies.

By the end of 1984, due to the growth of their companies, the Ippolitos' stock repurchase agreements were inadequately funded. Consequently, on January 17, 1985, John Ippolito completed five new applications for life insurance and submitted them to Northern Life for approval. In each of these applications, as in the previous insurance policies, Ippolito disclosed that he suffered from hemophilia. In addition, the applications requested that Ippolito provide information on his medical history and medical condition, including whether he had had a weight change in the past year; he responded in the negative.

On April 26, 1985, while the five policies were being considered for approval, but before they were delivered, Ippolito was seen as an outpatient at Michael Reese Hospital by his physician, Margaret Telfer, M.D., a hematologist. During her examination of Ippolito, Dr. Telfer noted that he had experienced a weight loss of approximately 20 pounds,[1] although he had not attempted to lose weight. At the time of his examination, Ippolito was experiencing a recurring sinus infection; according to Dr. Telfer, Ippolito was concerned about his recurrent infections, but was not concerned about the weight loss. In her report of the examination, Dr. Telfer noted her worry about the

---

[1]Dr. Telfer's appraisal of Ippolito's weight loss was based upon her observation of his appearance only; contrary to procedure, he was not weighed during his examination.

possible onset of AIDS or pre-AIDS; however, she said nothing to Ippolito of her worry nor did he give any indication to her that he was aware of this possibility.

On May 9, 1985, Ippolito was presented with the five policies and, as a condition of coverage, executed an "Amendment to Application" for each of the policies, verifying that all the information on the policies was correct and that he had continued in good health.

On June 25, 1985, Ippolito met with his insurance agent to complete an application for an additional insurance policy (sixth application). The sixth application contained the same questions as the previous five, including the question concerning weight loss. Ippolito responded to those question in essentially the same manner as he had done on the first five; he disclosed his hemophilia condition and further disclosed all his treatments and physicians in the previous five years. He did not, however, disclose his weight loss.[2]

On July 27, 1985, Ippolito was hospitalized at Michael Reese Hospital and treated by Dr. Telfer. At the time of his admittance, Ippolito was experiencing a dry cough and intermittent fevers. While at the hospital, Ippolito was diagnosed as suffering from pneumocystic carinii pneumonia, an opportunistic infection associated with AIDS. Dr. Telfer advised Ippolito of this infection and of the apparent onset of AIDS; she told him that he would not die from the infection, but that there was no cure for AIDS and "he would eventually die" from it.

After Ippolito was discharged from the hospital on August 10, 1985, he was treated again by Dr. Telfer as an outpatient on August 23, 1985; at that time, Dr. Telfer discussed the AIDS diagnosis again with him. Dr. Telfer also examined Ippolito on an outpatient basis on September 6 and September 27, 1985.

On October 1, 1985, Ippolito's agent presented him with the sixth policy and its accompanying "Amendment to Application." Ippolito signed the amendment, as he had done with the previous five policies; specifically, he verified that "the information stated in the application as amended by this form is true and correct in all material respects as of the date of this form," and that he had "continued in good health" and had "not suffered any *** sickness or consulted or been attended by a physician."

On February 8, 1987, Ippolito died as a result of pneumonia and renal failure, both related to his AIDS condition. Because of its rou-

---

[2]According to Dr. Telfer, she saw Ippolito in May 1985 at a dinner for the Hemophilia Foundation and he appeared "very cheerful" and had regained five pounds.

tine procedure to investigate claims presented within the first two policy years (the first five policies had effective dates of May 2, 1985, the sixth policy had an effective date of July 15, 1985), Northern Life conducted an investigation into the claims made by defendants.

As a result of that investigation, Northern Life filed a complaint for declaratory judgment on July 4, 1987, seeking rescission of all six policies. In its complaint, Northern Life alleged that Ippolito made certain misrepresentations in the applications for insurance and in the amendments to the applications that deemed the six policies void. Northern Life further averred that Ippolito breached his fiduciary duty to inform Northern Life as to the changed condition of his health during the pendency of the applications.

Following discovery, Northern Life moved for summary judgment on all six policies. As to the first five policies, Northern Life contended that Ippolito breached his fiduciary duty in not disclosing the change in his health condition (*i.e.*, his weight loss and sinus infection). Northern Life further contended that Ippolito made material misrepresentations on the amendments to the applications. As to the sixth policy, Northern Life argued that Ippolito made material misrepresentations on his application when he failed to disclose his weight loss, and further, he made material misrepresentations on his amendment to the application when he failed to disclose his AIDS diagnosis.

On August 6, 1990, after hearing arguments, the circuit court held that genuine issues of fact existed which precluded summary judgment as to the first five policies. The court, however, granted summary judgment on the sixth policy, holding that Ippolito had an intent to deceive Northern Life regarding the condition of his health, and that the sixth application and amendment contained misrepresentations material to Northern Life's risk.

Thereafter, defendants moved to have the court's order deemed final and appealable pursuant to Rule 304(a). Northern Life moved the court to reconsider its order and enter summary judgment on the first five policies. Defendants also asked the court to reconsider its order granting summary judgment on the sixth policy. The court denied both motions to reconsider and made its August 6, 1990, order final and appealable.

In this appeal from the court's grant of summary judgment on the sixth policy, defendants offer several reasons in support of their contention that the circuit court erred. Not only do defendants maintain that issues of fact preclude an award of summary judgment, they also argue that the court's award of summary judgment was premised

upon a faulty finding that the amendment was part of the application for insurance.

## A

Defendants initially argue that the circuit court erred in granting summary judgment based upon its finding that the "Amendment to Application" was part of the application for insurance. Specifically, defendants maintain that the amendment was not part of the negotiations phase of the insurance contract and, thus, material representations thereon cannot be used to defeat coverage.

For support, defendants rely upon section 154 of the Illinois Insurance Code, which provides:

"No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." (Ill. Rev. Stat. 1989, ch. 73, par. 766.)

Defendants argue that the October 1, 1985, "Amendment to Application" was not part of the negotiations for the policy because "negotiations are already concluded and the amendment simply records the parties' expressed intentions regarding the coverage that was bargained for."

Defendants' contention, however, is not borne out by the record. Nowhere does Gregory Hogue, Northern Life's chief underwriter, state in his deposition that negotiations were completed prior to the execution of the amendment. Rather, Hogue stated that Northern Life required the amendment to discern whether a change in health had occurred in the proposed insured. According to Hogue, had Ippolito disclosed his AIDS diagnosis, Northern Life would have declined coverage. Moreover, the language in the "Amendment to Application" further diminishes defendants' argument. The amendment provides that "[c]overage under the policy described, will be in force only after this form is signed." Thus, negotiations were not completed until sometime after the amendment had been signed by the insured and accepted by the insurer.

Not only does the record fail to support defendants' contention, but their reliance upon *Inter-Insurance Exchange of Chicago Motor Club v. Milwaukee Mutual Insurance Co.* (1978), 61 Ill. App. 3d 928, 378 N.E.2d 391, is misplaced. In *Inter-Insurance*, the insurer contended that certain misrepresentations made on the application voided coverage. The court, however, found that the "application was no longer pending but the policy without the application being attached had already been issued when the accident occurred." (*Inter-Insurance*, 61 Ill. App. 3d at 932.) Because the insurer failed to attach the application to the policy, the court held that it could not rely upon misrepresentations contained in the application.

In the instant case, both the application and the amendment were attached to the policy when delivered. As such, and because the amendment was clearly executed during negotiations for the policy, defendants' argument must fail.

## B

In a similar vein, defendants further argue that Northern Life has contractually restricted itself to misrepresentations made solely on the application and not on the amendment. For support, defendants point to Ippolito's life insurance policy, which states in its "general provisions":

"The entire contract is:
 1. this policy; and
 2. all applications, riders and amendments attached at the time of issue; and
 3. all later applications, riders and amendments we may attach or send you to attach.
Unless fraudulent, all statements made by or on behalf of anyone covered by this policy are representations and not warranties. Only statements found in an attached application may be used to cancel this policy or as our defense if we refuse to pay a claim."

Defendants maintain that Northern Life thus restricted its defenses to only those misstatements in "an attached application." Correspondingly, defendants argue, an application, by definition and implication, is distinct from an "amendment"; thus, since the alleged misrepresentation occurred in the "Amendment to Application," defendants maintain that Northern Life cannot now use the amendment to defeat coverage.

For support, defendants rely upon *National Fidelity Life Insurance Co. v. Karaganis* (7th Cir. 1987), 811 F.2d 357, a case they de-

scribe as "squarely on point." In *Karaganis*, the insurance policy contained a general provision similar to the one in the case at bar which restricted the insurer's defenses to misrepresentations made only on the application. The insurer in *Karaganis* attempted to void coverage based upon misrepresentations made by the insured in a "smoking statement," submitted some time after the initial application. The *Karaganis* court held that an insurer could not rely upon misrepresentations contained in the "smoking statement" to defeat coverage because that document did not indicate that it was part of the application. (*Karaganis*, 811 F.2d at 358-59.) The court, conversely, found that a completed medical examination report, submitted by the insured approximately one month after the application, was part of the application. (*Karaganis*, 811 F.2d at 358-59.) In so finding, the court stated "[u]nlike the medical examination report, the smoking statement does not bear the heading 'Supplement to Application,' but is labeled simply 'Smoking Statement'." *Karaganis*, 811 F.2d at 358-59.

■ Like the insured in *Karaganis*, Ippolito executed a document some time after completion of his application for insurance. That document, however, unlike the "smoking statement" in *Karaganis*, was clearly labeled "Amendment to Application." Thus, based upon the reasoning in *Karaganis*, we find that the amendment was clearly part of the application and, as such, Northern Life may rely upon misrepresentations in the amendment to deny coverage.

Defendants' reliance on *Roberts v. National Liberty Group of Cos.* (1987), 159 Ill. App. 3d 706, 512 N.E.2d 792, to support their contention, is also misplaced. In *Roberts*, the insured, in response to a television commercial, applied for life insurance offered only to persons under 60 years of age. The insured's initial application, submitted prior to his sixtieth birthday, was either lost or misplaced by the insurer; the subsequent application, received after the insured attained 60, was backdated so that the 60-year limitation could be avoided. After the insured died, the insurer attempted to void coverage on the basis that the insured had misrepresented his condition of health on the application. In finding for the insured, the *Roberts* court held that the insured's failure to notify the insurer of his cancer diagnosis, made one month prior to the insurer's receipt of his application, could not defeat coverage because equity required that, due to the insurer's "action of backdating the application and policy," the insurer was barred from asserting the nondisclosure defense. (*Roberts*, 159 Ill. App. 3d at 709-10.) *Roberts* is thus inapposite to the instant case.

Accordingly, the circuit court did not err in finding that the amendment was indeed part of the application, and thus, misrepresen-

tations on the amendment may defeat coverage. See, *e.g., Marshall v. Metropolitan Life Insurance Co.* (1950), 405 Ill. 90, 90 N.E.2d 194.

## C

■ Defendants, for the first time on appeal, maintain that there remains a question of fact whether Ippolito's case of AIDS was the maturation of a preexisting illness or a change in his health which would have required him to notify Northern Life; thus, defendants contend that summary judgment was improper.

Because the circuit court was not given the opportunity to review this issue, defendants cannot now raise it on appeal (*Jackson v. Chicago Board of Education* (1989), 192 Ill. App. 3d 1093, 1099, 549 N.E.2d 829); however, even if this court were to entertain defendants' argument, we must find in favor of Northern Life.

Defendants' contention is based upon their allegation that Ippolito began to suffer AIDS-like symptoms in April 1985. Defendants argue that because Northern Life was aware of the relationship between AIDS and hemophilia, the known connection put Northern Life on notice of the probability that Ippolito had already contracted AIDS by the time he applied for each of the six policies in 1985. Defendants acknowledge that, if Ippolito contracted AIDS during the pendency of the application, "it may be true that he had a legal duty as well as a contractual obligation to disclose this to Northern Life"; however, they argue that Ippolito's AIDS was simply a manifestation of a preexisting AIDS infection, and thus, he fulfilled his duty at the time of application when he disclosed his hemophilia.

Defendants' reliance on *Seidler v. Georgetown Life Insurance Co.* (1980), 82 Ill. App. 3d 361, 402 N.E.2d 666, where the insurer did not require an affirmation of continued good health like that in the instant case, is misplaced. The rationale of *Seidler* is that if the proposed insured discloses a medical condition, the insurer may not void the policy if the proposed insured suffers an illness during the pendency of the application which is solely a manifestation of the previously disclosed condition. (*Seidler*, 82 Ill. App. 3d 361.) Here, despite defendants' assertions otherwise, the connection between AIDS and hemophilia is not so great that Ippolito's disclosure of hemophilia put Northern Life "on notice" that he also had AIDS. Thus, the purported "issue of fact," which defendants argue precludes summary judgment, is not material to the disposition of the instant case. See, *e.g., National Boulevard Bank v. Georgetown Life Insurance* (1984), 129 Ill. App. 3d 73, 472 N.E.2d 80.

## D

Defendants next contend that summary judgment was improperly granted because Ippolito did not intentionally misrepresent his health on the amendment and, further, that that misrepresentation did not materially affect Northern Life's risk.

Summary judgment is appropriate only when the pleadings, depositions, affidavits, and admissions on file present no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (*Wilder Binding Co. v. Oak Park Trust & Savings Bank* (1990), 135 Ill. 2d 121, 552 N.E.2d 783.) Correspondingly, where certain facts are not in dispute with respect to the terms of a contract, the construction of the contract and its effect on insurance coverage are questions of law which can properly be determined on a motion for summary judgment. *Bohnen International, Inc. v. Liberty Mutual Insurance Co.* (1983), 120 Ill. App. 3d 657, 458 N.E.2d 644.

■ The statute governing misrepresentations made in insurance applications is section 154 of the Illinois Insurance Code. As previously stated, that statute provides that only a misrepresentation which has "been made with actual intent to deceive" or which "materially affects *** the acceptance of the risk" can defeat a policy for insurance. (Ill. Rev. Stat. 1989, ch. 73, par. 766.) Thus, a life insurance policy can be held void if either the applicant made misrepresentations with actual intent to deceive or the misrepresentations materially affected the risk of the insurer. *Campbell v. Prudential Insurance Co.* (1958), 15 Ill. 2d 308, 312-13, 155 N.E.2d 9.

A misrepresentation in an application for insurance is a statement of something as a fact which is untrue and affects the risk taken by the insurer. (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 577, 60 N.E.2d 207; *Garde v. Country Life Insurance Co.* (1986), 147 Ill. App. 3d 1023, 1031, 498 N.E.2d 302.) Thus, whether an insured's statements are material is determined by whether reasonably careful and intelligent persons would have regarded the facts stated as substantially increasing the chances of the events insured against, so as to cause a rejection of the application. (*Weinstein*, 389 Ill. 571.) Incomplete answers or a failure to disclose material information in response to a question in an application may thus constitute a material misrepresentation. (*Garde*, 147 Ill. App. 3d at 1031.) A statement cannot be misleading, however, unless an insurer relies upon it in order to determine its risk. *Logan v. Allstate Life Insurance Co.* (1974), 19 Ill. App. 3d 656, 659, 312 N.E.2d 416.

In establishing the materiality of a misrepresentation, an insurer may rely upon the underwriter's testimony or testimony of its employees. (*Alperin v. National Home Life Assurance Co.* (1975), 32 Ill. App. 3d 261, 336 N.E.2d 365.) Ordinarily, the materiality of a misrepresentation is a question of fact; however, where the misrepresentation is of such a nature that all would agree that it is or is not material, the question is appropriate for summary judgment. *Garde*, 147 Ill. App. 3d at 1031; *La Penta v. Mutual Trust Life Insurance Co.* (1954), 4 Ill. App. 2d 60, 66, 123 N.E.2d 165.

In the instant case, the record indicates that Northern Life did indeed rely upon representations made by Ippolito in the amendment. Gregory Hogue, Northern Life's chief underwriter, stated that disclosures made by Ippolito in the amendment would be considered in evaluating whether Northern Life could accept the risk. According to Hogue, if Ippolito had disclosed his AIDS diagnosis on the amendment, Northern Life would have declined coverage because AIDS was then, and is now, uninsurable. Further, Clifton L. Reeder, M.D., stated that, although he was not an employee of Northern Life, he was familiar with industry-wide practices and, in his opinion, Ippolito's misrepresentation was material. Despite defendants' protestations that the testimony of Hogue and Reeder did not properly establish Northern Life's underwriting policies and standards, we find that the testimony of both was proper and sufficient.

Certainly, it is clear that Ippolito misrepresented his condition of health on the amendment to the sixth application. Not only did he fail to disclose that answers on the sixth application were false due to the subsequent diagnosis of AIDS (an obvious change in health), but he wrongly stated that he continued in good health.[3]

Accordingly, we find that reasonably careful and intelligent persons would regard the diagnosis of AIDS, an uninsurable condition, as substantially increasing the risk assumed by Northern Life. Thus, it was not improper for the circuit court to hold that Ippolito materially misrepresented his condition of health on the October 1, 1985, amendment.

---

[3]Defendants' argument that Ippolito somehow thought that he was in "good health" despite his AIDS diagnosis, because Dr. Telfer told him that he would not die immediately from AIDS, strains reason. However, we need not determine whether Ippolito was informed by Dr. Telfer that his AIDS diagnosis was terminal; it is clear from the record that Ippolito failed to report on the amendment his obvious change of health.

Likewise, it appears from the record that Ippolito's misrepresentation was deliberate and intentional. Northern Life had not sent out the amendment merely because of a change in policy terms; rather, it had sent the amendment to determine if Ippolito's health had changed since the date of the application. Because, "if any length of time elapses between the making of the application and the issuing of the policy, it is the duty of the insurer to make inquiry when the policy is delivered as to the condition of the health of the insured," Northern Life insisted that the amendment be completed. (*James v. National Life & Accident Insurance Co.* (1932), 265 Ill. App. 436, 438.) Ippolito learned of his AIDS diagnosis in late July 1985 and he discussed this diagnosis with his physician during several subsequent examinations. Thus, Ippolito's assertion made in the amendment on October 1, 1985, that he was in good health was clearly an intentional misrepresentation. See, *e.g., Carroll v. Preferred Risk Insurance Co.* (1966), 34 Ill. 2d 310, 215 N.E.2d 801; *Western & Southern Life Insurance Co. v. Tomasun* (1934), 358 Ill. 496, 193 N.E. 451.

The *Carroll* court described the relationship between the insured and the insurer as one requiring

"good faith on the part of the applicant because of the peculiar character of the insurance contract. The applicant has an obligation imposed by law to notify the insurer of any changed condition materially affecting the risk during the pendency of the application for insurance." (*Carroll*, 34 Ill. 2d at 312.)

In *Stipcich v. Metropolitan Life Insurance Co.* (1928), 277 U.S. 311, 316-17, 72 L. Ed. 895, 898, 48 S. Ct. 512, 513-14, the United States Supreme Court said of the relationship between the applicant and the insurer that

"even the most unsophisticated person must know that in answering the questionnaire and submitting it to the insurer he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy, [citation] or if a policy has been issued, it has a valid defense to a suit upon it. [Citation.]"

Accordingly, based on the foregoing, we find that the amendment was clearly part of the application and, as such, any misrepresentations thereon support avoidance of the policy. Because Ippolito's

undisclosed AIDS diagnosis was a material risk to Northern Life, we find that the circuit court did not err in granting Northern Life's motion for summary judgment on the sixth policy.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.