## NEW ENGLAND MUTUAL LIFE INSURANCE CO., Plaintiff,

v.

## BANK OF ILLINOIS IN DUPAGE, et al., Defendants.

### No. 96 C 4090.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 20, 1998.

---

**2.** The defendants failed to produce records for 1995.

David Joseph Novotny, Janice L. Cleary, Peterson & Ross, Chicago, IL, for Plaintiff.

John W. Long, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is plaintiff New England Mutual Life Insurance Company's motion for summary judgment. For the reasons that follow, the court grants plaintiff's motion.

### I. BACKGROUND[1]

On January 22, 1994, Fred Penoyer ("Penoyer") met with insurance salesman Michael Carbon ("Carbon") in Lombard, Illinois. At that time, Penoyer and Carbon together filled out a two-part application for a life insurance policy from defendant New England Mutual Life Insurance Company ("New England Mutual").

Part II of the application asked for certain medical information. Part II was filled out as follows: Carbon would read the question to Penoyer; Penoyer would respond either "yes" or "no"; and then Carbon would write down Penoyer's responses on the application. Question 45(b) of the application asked: "Have you ever been treated or diagnosed as having: ... High blood pressure; stroke; or disease of heart, blood or circulatory system?" Penoyer responded "no." Question 46 asked: "Other than above, have you within the past 5 years: had a checkup or consultation; been a patient in a medical facility; or been advised to have any diagnostic test, hospitalization or surgery?" Penoyer responded "no." Finally, question 47 asked Penoyer to "[g]ive details to each Yes answer to questions 42 through 46." Nothing was filled in on question 47.

After completing the application with Carbon, Penoyer executed the application in Carbon's presence. The application contains the following declaration: "To the best of my knowledge and belief, the answers recorded are true and complete." Penoyer signed the application and dated it January 22, 1994.

On February 8, 1994, Penoyer met with Dr. Julie Levering for the purpose of undergoing a physical examination. During the examination, the paramedical portion of the application was completed as follows: Dr. Levering would ask Penoyer the question; Penoyer would respond; and then Dr. Levering would write the responses on the application. Question 2(d) of the paramedical portion asked: "Have you ever been treated for or ever had any known indication of: ... Rheumatic fever or other severe infection; high blood pressure, heart murmur, chest pain, heat attack, varicose veins, phlebitis or other disorder of the heart or blood vessels?" Penoyer responded "no." Questions 4(a), (b),

---

1. Unless otherwise indicated, the following recount of the undisputed facts is drawn from the parties' Local General Rule 12(M) and 12(N) statements. *See infra* Part II.A (discussing the determination of the undisputed facts).

and (d) asked: "Other than above, have you within the past 5 years: Had any mental or physical disorder? Had a checkup, consultation, illness, injury or surgery? ... Had an electrocardiogram, x-ray, or other diagnostic test?" Penoyer responded "yes" to all three of those questions.

Dr. Levering asked Penoyer to explain any affirmative answers given in response to the questions asked, including any diagnoses, dates, duration, and names and addresses of all attending physicians and medical facilities. As to questions 4(a), (b), and (d), Penoyer explained that in 1992, he was treated at Thunderbird Hospital in Phoenix, Arizona for gallbladder removal; in 1993, he had a "chest x-ray" which was "negative"; and in 1994, he underwent "lumbar series x-rays" which were "negative" and an "IVP" which was "negative." As to other affirmative answers, Penoyer identified Dr. Barry Lewis as his personal physician who treated him for possible pneumonia in 1991, pneumonia in 1993, possible kidney stones in 1994, and muscle spasms in 1994. Penoyer also disclosed that he had been treated in 1960 for a bruise to the kidney that resulted from a football injury.

After completing the paramedical portion of the application, Penoyer reviewed that portion of the application. The document contained the following declaration: "I declare that my answers to the foregoing questions are true and complete and are correctly recorded to the best of my knowledge and belief." Penoyer signed directly below this declaration.

After receiving the application and payment of a premium, (Pl.'s Ex. 1 (Joint Stipulation of Uncontested Facts) (hereinafter "J. Stip.") ¶ 41), New England Mutual prepared and issued its Ordinary Life Policy, Number 8821001 ("the policy"), designating Penoyer as the insured, in the face amount of $750,000 with an additional protection amount of $250,000. The policy contains a provision which states that the policy is issued "in reliance on the statements made in the Application for the insurance." (Pl.'s Ex. 7 at 4.) The date of issue of the policy was July 28, 1994.

Penoyer died on January 4, 1996, which was within the two-year period of contestabil-ity. Because Penoyer died within the two-year contestability period, New England Mutual conducted an investigation into the actual health of Penoyer prior to the dates on which he applied for the policy. The investigation uncovered the following medical history which was not disclosed by Penoyer on the application to New England Mutual for the policy:

1. In June and July of 1989, Dr. G. Martin Mullen examined Penoyer at the Loyola Medical Center Outpatient Clinic for multiple complaints, including a complaint of chest pain and exhaustion. Based on Penoyer's description of the chest pain, Dr. Mullen diagnosed Penoyer as having "atypical chest pain." Penoyer told Dr. Mullen that he had this "'atypical chest pain' for 'more than five years.'"

Dr. Mullen then performed a physical examination on Penoyer, which revealed "mildly elevated" blood pressure readings which "could be a significant risk factor for cardiovascular complications." Dr. Mullen also performed a cardiac examination, which revealed an "irregular rhythm, a slightly accentuated second heart sound and the presence of an abnormal cardiac murmur suggestive of aortic valve leakage."

Pursuant to Dr. Mullen's orders, Penoyer underwent a number of diagnostic tests, including a chest x-ray, a Doppler echocardiogram, and a two-dimensional echocardiogram. The chest x-ray revealed an elongated and prominent aorta, which confirmed Dr. Mullen's diagnosis of aortic regurgitation murmur. The Doppler and two-dimensional echocardiograms confirmed that Penoyer had aortic valve disease.

On July 7, 1989, Penoyer again saw Dr. Mullen. At that time, Dr. Mullen discussed his diagnosis of aortic valve disease with Penoyer. Dr. Mullen recommended that Penoyer return to see him in three months to monitor the aortic valve regurgitation murmur and its effect on his left ventricle and aorta. (Pl.'s 12(M) Statement ¶ 39; Pl.'s Ex. 10 at C6; J. Stip. ¶ 16.)

2. On March 17, 1992, in Sun City, Arizona, Penoyer underwent a cardiac catheterization and an echocardiogram.

3. On March 25, 1992, Penoyer went to see Dr. Moran for a second opinion concerning some pains and the cardiac catheterization that was done on March 17, 1992. (Pl.'s 12(M) Statement ¶ 40; J. Stip. ¶ 18.) Penoyer provided Dr. Moran with a personal and medical history, which included the fact that he (1) was an x-ray technician; (2) had a history of cardiomegaly for over twenty-five years; and (3) had undergone a number of diagnostic tests in Sun City, Arizona, which included an echocardiogram and a cardiac catheritization. Penoyer also told Dr. Moran that (1) "he had 'aortic regurgitation, trivial coronary artery disease,' and a 'dilated aorta all the way down'" and (2) he was "scared shitless."

At that time, Dr. Moran physically examined Penoyer. The exam revealed an abnormally elevated systolic blood pressure and a murmur of aortic insufficiency. Penoyer then underwent a chest x-ray, which revealed the dilated aorta.

4. On June 3, 1992, Penoyer underwent an echocardiogram at Midwest Heart Specialists which revealed a calcified aortic valve, an aneurysmal dilatation of the proximal ascending aorta, and left ventricular enlargement. On that day, he also underwent a Doppler echocardiogram at Midwest Heart Specialists, which revealed a mild mitral regurgitation, mild aortic stenosis, and a mild to moderate aortic insufficiency.

5. On July 15, 1992, Penoyer returned to see Dr. Moran. Penoyer complained of right-sided numbness and some right leg weakness.

6. On September 22, 1992, Penoyer underwent a follow up echocardiogram. (Pl.'s.12(M) Statement ¶ 47; J. Stip. ¶ 25.) The echocardiogram measured Penoyer's aortic aneurysm at 6 to 7 centimeters, which is a significant aneurysm. (Pl.'s 12(M) Statement ¶ 47; J. Stip. ¶¶ 25–26.)

7. In 1993, Penoyer continued to see Dr. Moran for further monitoring of his aneurysm, blood pressure, and related cardiovascular problems. In 1993, Penoyer underwent two more follow-up echocardiograms at Midwest Heart Specialists. The first, performed on March 30, 1993, revealed a dilated aortic root, abnormal aortic valve, and aortic regurgitation. The second follow-up echocardiogram, performed on December 6, 1993, showed no significant change from the echocardiogram performed on March 30, 1993.

8. Penoyer saw Dr. Moran five times during 1992 and at least three times during 1993. (Pl.'s Ex. 9 at 48.)

9. Penoyer was taking Altace (an antihypertension medication) throughout the entire time that he was under Dr. Moran's care.

It is undisputed that Penoyer did not disclose on his application for the policy any of the facts contained in the above paragraphs one through nine. Further, it is undisputed that Penoyer did not disclose the names of either Dr. Moran or Dr. Mullen on the application in any way.

Or July 8, 1996, New England Mutual filed a two-count complaint against defendants Leslie F. Penoyer, Kathryn G. Penoyer, Fred L.B. Penoyer, Lynette J. Penoyer, and Alana Smaldone, who are the named beneficiaries of the policy, and defendant Bank of Illinois in DuPage, which has an assignment interest in the policy. Count I is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201, seeking a declaration from this court that New England Mutual has no obligations or liability under the policy, other than to refund the premiums paid. Count II is for rescission of the policy. The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as there exists complete diversity between plaintiff and all defendants and the amount in controversy exceeds $75,000.

The matter is currently before the court on New England Mutual's motion for summary judgment. New England Mutual contends that it is entitled to judgment as a matter of law because the policy is void pursuant to section 154 of the Illinois Insurance Code, 215 ILCS § 5/154, since (1) Penoyer made misrepresentations in the application (2) with the intent to deceive New England Mutual or

which materially affected the acceptance of the risk or the hazard assumed by New England Mutual and (3) New England Mutual relied on these misrepresentations when it issued the policy. Defendants argue that New England Mutual could not have relied on the misrepresentation or, alternatively, is estopped from relying on the misrepresentations to avoid the policy, because New England Mutual knew about Penoyer's medical condition before it issued the policy.

## II. *DISCUSSION*

### A. *Local General Rule 12*

Before addressing the merits of New England Mutual's motion for summary judgment, the court must address defendants' failure to comply with Local General Rule 12 ("Rule 12"). Rule 12(M) requires the party moving for summary judgment to file, among other items, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." LOCAL GEN. R. 12(M). The required statement is to consist of short numbered paragraphs, including within each paragraph specific cites to the record which support the facts set forth. *Id.* Rule 12(N) then requires the opposing party to file, among other items,

> a concise response to the movant's statement that shall contain: (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the records, and other supporting materials relied upon, and (b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

LOCAL GEN. R. 12(N)(3). Rule 12(N) further provides that "[a]ll material facts set forth in the statement of the moving party will be deemed admitted unless controverted by the statement of the opposing party." *Id.* The Seventh Circuit has upheld strict compliance with Rule 12 on numerous occasions. *Huff v. UARCO Inc.*, 122 F.3d 374, 382 (7th Cir. 1997).

In this case, New England Mutual filed a proper Rule 12(M) statement. In response, defendants submitted "Defendant's Rule 12(N) Statement," in which defendants deny the facts contained in nine of New England Mutual's paragraphs. (Defs.' 12(N) Statement ¶¶ 26, 32, 34, 39, 40, 47, 48, 53, 54.) However, in response to paragraphs 32, 39, 40, 47, 53, and 54, defendants simply denied the facts without providing a cite to the record or any other supporting materials. Except for the second statement of paragraph 39 and the facts contained in note 1 of paragraph 40, all of the facts contained in those paragraphs are supported by the record and, thus, are deemed admitted as they are uncontested. *E.g., Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997); *Benion v. Bank One, Dayton*, 967 F.Supp. 1031, 1033 n.1 (N.D.Ill.1997).

In addition, in paragraphs 10, 12, 30, 33, 43, and 46, defendants admitted the facts contained therein and then proceeded to raise additional factual assertions. Such additional facts went beyond the "concise" response required by Rule 12(N)(3)(a). *Daulo v. Commonwealth Edison*, 938 F.Supp. 1388, 1395 (N.D.Ill.1996). The additional factual assertions should have been submitted in a separate statement of additional facts pursuant to Rule 12(N)(3)(b). *Id.* New England Mutual would then have been required to respond to those additional facts or have them deemed admitted. LOCAL GEN. R. 12(M).

The court could strike the additional factual assertions made in defendants' Rule 12(N)(a)(3) response. *Id.* (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994)). However, in fairness to defendants, the court will not do so. Instead, the court will determine if the additional facts listed in the 12(N)(3)(a) response are supported by the evidence and then go from there.

### B. *Legal standard for deciding motion for summary judgment*

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir.1997).

The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson,* 477 U.S. at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party presents a *prima facie* showing that he is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings but must come forward with specific evidence which shows that a genuine issue for trial exists. *Anderson,* 477 U.S. at 256–57; *Celotex,* 477 U.S. at 324; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989).

## C. *New England Mutual's claim for rescission*

■ New England Mutual claims that it is entitled to rescind the insurance policy pursuant to section 154 of the Illinois Insurance Code.[2] Section 154 provides in pertinent part:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance ... shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS § 5/154. Thus, in order to prevail on its summary judgment motion, New England Mutual must show that the only reasonable inferences from the record are that (1) a misrepresentation was made and (2) the misrepresentation either was made with an intent to deceive or materially affected the risk accepted or hazard assumed. *Campbell v. Prudential Ins. Co. of Am.,* 15 Ill.2d 308, 155 N.E.2d 9, 11 (1958); *Northern Life Ins. Co.*

*v. Ippolito Real Estate Partnership,* 234 Ill. App.3d 792, 176 Ill.Dec. 75, 81, 601 N.E.2d 773, 779 (1992); *see Methodist Med. Ctr. of Ill. v. American Med. Sec. Inc.,* 38 F.3d 316, 319 (7th Cir.1994); *Apolskis v. Concord Life Ins. Co.,* 445 F.2d 31, 35 (7th Cir.1971).

### 1. Misrepresentation

First, New England Mutual must show that the only reasonable inference from the record is that Penoyer made a misrepresentation in the application. New England Mutual argues that there is no genuine dispute as to whether Penoyer made a misrepresentation on his application because it is undisputed that Penoyer failed to disclose his history of aortic aneurysm, aortic insufficiency, aortic stenosis, aortic regurgitation and related problems and his extensive history of medical visits and diagnostic tests in connection with these disorders (collectively referred to as "Penoyer's history of aortic disease").

■ In filling out an insurance application, the insurance applicant has the duty to act in good faith towards the insurance company. *Carroll v. Preferred Risk Ins. Co.,* 34 Ill.2d 310, 215 N.E.2d 801, 802 (1966); *Garde v. Country Life Ins. Co.,* 147 Ill.App.3d 1023, 101 Ill.Dec. 120, 126, 498 N.E.2d 302, 308 (1986). This means that an insurance applicant must make a complete and truthful disclosure of all relevant information so that the insurer may determine whether the applicant meets the insurer's underwriting criteria. *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308.

■ A misrepresentation in an application for insurance is a statement of something as a fact which is untrue and affects the risks undertaken by the insurer. *Weinstein v. Metropolitan Life Ins. Co.,* 389 Ill. 571, 60 N.E.2d 207, 210 (1945); *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308; *Methodist Med. Ctr.,* 38 F.3d at 319. An incomplete answer or a failure to disclose material information in response to a question can constitute a misrepresentation. *Cohen v. Washington Nat'l Ins. Co.,* 175 Ill.App.3d 517, 124 Ill.Dec. 948, 950, 529 N.E.2d 1065, 1067 (1988); *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308; *Hatch v. Woodmen Accident & Life*

**2.** The parties do not dispute that Illinois law governs this diversity action.

*Co.,* 88 Ill.App.3d 36, 42 Ill.Dec. 925, 928, 409 N.E.2d 540, 543 (1980); *Methodist Med. Ctr.,* 38 F.3d at 320. An applicant's failure to disclose relevant information will not be excused on the grounds that the applicant believed the problem was minor and not material enough to mention. *Apolskis,* 445 F.2d at 35. Rather, the applicant must make a full and complete disclosure of all relevant information and let the insurer determine the materiality of the information. *Garde,* 101 Ill.Dec. at 126, 498 N.E.2d at 308; *Apolskis,* 445 F.2d at 35.

For a false statement to be a misrepresentation, the insurance company must have reasonably relied on the statement in order to determine the company's risk. *Northern Life Ins. Co.,* 176 Ill.Dec. 75, 601 N.E.2d at 779; *Logan v. Allstate Life Ins. Co.,* 19 Ill.App.3d 656, 312 N.E.2d 416, 420 (1974). An insurance company may rely on the truthfulness of an insurance applicant's answers and has no duty to conduct an independent investigation into the application's answers. *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308; *Garde v. Inter–Ocean Ins. Co.,* 842 F.2d 175, 178 (7th Cir.1988); *Apolskis,* 445 F.2d at 35; *Commercial Life Ins. Co. v. Lone Star Life Ins. Co.,* 727 F.Supp. 467, 471 (N.D.Ill.1989).

In this case, it is undisputed that Penoyer failed to disclose several relevant facts. Penoyer failed to disclose that he (1) had been taking Altace (an anti-hypertension medication) for a period of time; (2) had been a patient of Dr. Mullen and Dr. Moran; (3) had seen Dr. Moran at least five times during 1992 and three times in 1993; (4) had undergone a number of diagnostic tests, including blood tests, urine tests, pulmonary function tests, thallium treadmill tests, chest x-rays, and several echocardiograms between the years of 1989 and 1993; (5) had been diagnosed as having aortic valve disease by Dr. Mullen in 1989; and (6) knew that he had aortic regurgitation, coronary artery disease, and a dilated aorta. Further, Penoyer did not disclose the names of Dr. Mullen or Dr. Moran in any way on the application. The questions in the application called for the disclosure of the above information.

There is also no genuine issue as to whether New England Mutual relied on these false statements when it issued the policy. The policy contains a provision which states that the policy is issued "in reliance on the statements made in the Application for the insurance." (Pl.'s Ex. 7 at 4.) Moreover, in the parties' joint stipulation of uncontested facts, the parties state that the policy was issued in consideration of the application. (J. Stip. ¶ 41.) Finally, New England Mutual has submitted an affidavit from Dr. Phillip Sullivan, who is New England Mutual's Second Vice President and Medical Director and who has been an employee of New England Mutual for over twenty-four years. (Aff. of Phillip G. Sullivan, M.D. (hereinafter "Sullivan Aff.").) In his affidavit, Dr. Sullivan testifies that New England Mutual "would not have approved the application for life insurance and issued the Policy but would have declined the application" if New England Mutual would have "been aware of Fred H. Penoyer's history of aortic aneurysm, aortic insufficiency, aortic stenosis, aortic regurgitation, aortic dilatation, and related problems and his history of medical tests and visits in connection therewith." (Sullivan Aff. ¶ 15.) *See Northern Life Ins. Co.,* 176 Ill.Dec. 75, 601 N.E.2d at 780 (finding that the insurer did rely upon the insured's representations where the insurer's chief underwriter stated that it would have declined coverage if the insured had disclosed is true medical condition).

Defendants, however, argue that New England Mutual could not have reasonably relied on Penoyer's false statements because the evidence shows that New England Mutual knew about Penoyer's history of aortic disease before issuing the policy. Defendants argue that New England Mutual had such knowledge through (1) Carbon, who was an agent for New England Mutual, and (2) the records of Dr. Lewis. For the following reasons, the court rejects defendants' arguments.

#### a. Carbon's knowledge

Defendants first argue that New England Mutual had knowledge of Penoyer's history of aortic disease because Carbon was an agent of New England Mutual and Carbon "knew that Penoyer had problems with his

heart and had seen a cardiologist." (Defs.' Resp. at 4.) In support of this argument, defendants have submitted portions of Carbon's deposition and two previous applications for life insurance policies that Carbon sold to Penoyer.

■ In certain situations, the knowledge of the insurer's agent will be imputed to the insurer. *Logan*, 312 N.E.2d at 421. However, the court will refuse to impute the knowledge of the agent to the insurance company "where the applicant has acted in bad faith, either on his own or in collusion with the insurer's agent." *Logan*, 312 N.E.2d at 421; *Pistas v. New England Mut. Life Ins. Co.*, 843 F.2d 1038, 1040 (7th Cir.1988); *see also Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 320, 48 S.Ct. 512, 72 L.Ed. 895 (1928); *Marionjoy Rehab. Hosp. v. Lo*, 180 Ill.App.3d 49, 129 Ill.Dec. 296, 299, 535 N.E.2d 1061, 1064 (1989); *Tesluk v. Metropolitan Life Ins. Co.*, 130 Ill.App.2d 290, 264 N.E.2d 566, 569–70 (1970).

In this case, the only reasonable inference from the record is that Penoyer acted in bad faith when he filled out the application for the policy. Within the five year period prior to filling out the application, Penoyer (1) had consulted at least two doctors, Dr. Moran and Dr. Mullen, about his condition and (2) had undergone multiple diagnostic tests, including at least one catheritization, two chest x-rays, and eight echocardiograms. It is undisputed that Dr. Mullen discussed his diagnosis of aortic disease with Penoyer. It is also undisputed that Penoyer told Dr. Moran that he (1) had aortic regurgitation; (2) had coronary artery disease; (3) had a "dilated aorta all the way down"; and (4) was "scared shitless." It is also undisputed that Penoyer had been an x-ray technician. The only reasonable inference from these undisputed facts is that Penoyer knew that he had a serious medical condition that he did not disclose on his application.

In contrast to what he failed to disclose, Penoyer did disclose other selected portions of his medical history. In his application, he disclosed that in 1992, he was treated at Thunderbird Hospital in Phoenix, Arizona for gallbladder removal; in 1993, he had a "chest x-ray" which was "negative"; in 1994, he underwent "lumbar series x-rays" which were "negative" and an "IVP" which was "negative"; and in 1960, he was treated for a bruise to the kidney that resulted from a football injury. He also identified Dr. Barry Lewis as his personal physician who treated him for possible pneumonia in 1991; pneumonia in 1993; possible kidney stones in 1994; and muscle spasms in 1994.

Given the extent of what Penoyer knew and what he chose to disclose, the only reasonable inference is that Penoyer consciously chose not to disclose the facts that related to his history of aortic disease. It would not be reasonable to infer that Penoyer forgot about this extensive portion of his medical history both at the time he met with Carbon and at the time he met with Dr. Levering. Similarly, it would not be reasonable to infer that Penoyer thought that this portion of his medical history was not relevant. Penoyer had a duty to act in good faith and make a complete and full disclosure of the known and obviously important condition; Penoyer acted in bad faith when he failed to do so. *See Logan*, 312 N.E.2d at 420 (holding that the insured acted in bad faith when he failed to disclose relevant information on his insurance application); *Apolskis*, 445 F.2d at 35 ("In similar situations involving suppression of an obviously, known and apparently material medical condition or treatment, courts have had no difficulty finding bad faith or intent to deceive.").

Defendants argue that there are three facts which raise a genuine issue as to whether Penoyer acted in bad faith.[3] First, defendants contend that the fact that Penoyer had $900,000 of life insurance from other companies which he was going to replace with the New England Mutual policy shows that Penoyer did not act in bad faith when he failed to disclose the facts related to his history of aortic disease. The court, however, fails to see the logic in this argument. For whatever reason, Penoyer was replacing existing insurance from the other companies with insur-

---

3. Defendants' arguments were actually directed towards New England Mutual's argument that the policy is void because Penoyer made the misrepresentations with an intent to deceive. However, these arguments are equally applicable to a "bad faith" determination.

ance from New England Mutual. Penoyer wanted New England Mutual to issue the policy so he chose not to disclose facts relevant to his history of aortic disease. The fact that he was replacing insurance from other companies does not relieve Penoyer of his good faith duty to make a complete and full disclosure of this obviously relevant information.

Defendants next contend that the fact that Penoyer had obtained life insurance policies from other companies even though he disclosed his "heart problem" shows that Penoyer was not acting in bad faith by failing to disclose the omitted medical history to New England Mutual. Defendants, however, overstate what Penoyer disclosed on previous applications. On the two previous applications, Penoyer had disclosed only that he had a heart murmur over twenty years ago that had not been heard by a doctor since. He had not disclosed the facts related to his history of aortic disease. In fact, he could not have because those facts occurred after he filled out the previous applications. The disclosures on those previous applications come nowhere close to being analogous to the facts which Penoyer failed to disclose in this case. The omitted medical history consists of completely different facts, tests, and doctors and is exponentially more serious and relevant. Further, the law is that an "insured's failure to disclose ... cannot be excused an the ground that he believed the problem was a minor one and was not material enough to mention." *Apolskis*, 445 F.2d at 35.

Finally, defendants argue that the fact that Penoyer's condition had not deteriorated from the time he signed the previous applications to the time he signed the New England Mutual application shows that Penoyer acted in good faith. Like the other facts, however, this fact does not raise a genuine issue as to whether Penoyer acted in good faith. It makes no difference whether Penoyer's condition deteriorated, remained stable, or improved. Penoyer knew he had a serious medical condition, and he had a duty to act in good faith and make a full and complete disclosure of such a condition.

In sum, the court finds that the only reasonable inference from the record is that Penoyer acted in bad faith when he chose not to disclose on his application the many facts related to his history of aortic disease. There is simply no evidence from which a different inference reasonably could be drawn. Because Penoyer acted in bad faith, the court will not impute to New England Mutual whatever knowledge Carbon had.[4] *See Logan*, 312 N.E.2d at 421 (holding that the agent's knowledge of the insured's true medical history would not be imputed to the insurer where the application acted in bad faith).

### b. The records of Dr. Lewis

Defendants next argue that New England Mutual had knowledge of Penoyer's history of aortic disease because the records of Dr. Barry Lewis made New England Mutual "fully aware of Penoyer's medical problems." (Defs.' Resp. at 5.) In support of the argument, defendants have submitted one page of Dr. Lewis' records, which documents Penoyer's June 26, 1985 initial visit to Dr. Lewis.[5] On that page, the records state that Penoyer (1) had suffered chest pains for six days; (2) had diagnostic tests; (3) had visited a cardiologist; and (4) had told Dr. Lewis that he had "mild 1 BP & cardiomegaly." (Defs.' Ex. M.)

New England Mutual admits that it obtained the records of Dr. Lewis before issuing the policy. In fact, the page of Dr. Lewis' records on which defendants rely was included in New England Mutual's exhibits in support of its motion for summary judgment. (Pl.'s Ex. 11.)[6] However, New England Mutual argues that the records in no

---

4. The court notes, however, that it would not be reasonable to infer from the evidence that Carbon knew of the specific medical condition that New England Mutual claims constituted the misrepresentation. *See Smith*, 550 F.Supp. at 898.

5. Defendants claim that the record is from June 26, 1992. (Defs.' Resp. at 3.) However, the records clearly are from June 26, 1985.

6. The court notes that neither party objects to the authenticity or the admissibility of these records; thus, the court will consider these records in deciding this motion for summary judgment. *See Friedel v. City of Madison*, 832 F.2d 965, 972 n.1 (7th Cir.1987).

way indicate that Penoyer had a history of aortic aneurysm or any other disease or disorder of the aorta. In support of this argument defendants offered the affidavit of Dr. Sullivan, which addressed Dr. Lewis' records. In his affidavit, Dr. Sullivan testifies as follows:

> During the course of underwriting the Policy, New England did obtain the records of Dr. Barry Lewis concerning Fred H. Penoyer. However, these records gave no indication that Fred H. Penoyer had a history of aortic aneurysm or any other disease or disorder of the aorta. The tests performed on Fred H. Penoyer while he had been seeing Dr. Lewis were all within normal limits, with the exception of mildly elevated blood pressure. Nothing contained in Dr. Lewis' records indicated that the Policy should be rated at a higher premium level than issued or that the application should be declined.

(Sullivan Aff. ¶ 14.)

Defendants have not argued that Dr. Sullivan's affidavit fails to meet the requirements of Federal Rule of Civil Procedure 56(e). The court finds that it does. *See National Diamond Syndicate, Inc. v. UPS*, 897 F.2d 253, 260 (7th Cir.1990) (explaining the requirements of Rule 56(e) affidavits). Dr. Sullivan is a medical doctor who also holds a masters of public health. (Sullivan Aff. at 6.) He is licensed to practice medicine in Massachusetts and is certified by the American Board of Insurance Medicine. (*Id.*) He has been employed by New England Mutual since 1974, starting out as an Assistant Medical Director and working his way up to Second Vice President and Medical Director. (*Id.* ¶ 1.) He has been the Second Vice President and Medical Director of New England Mutual since 1986. (*Id.* ¶¶ 1–2.) Part of his duties include the assessments of risks for life insurance. (*Id.* ¶ 1.) Dr. Sullivan reviewed the records of Dr. Lewis, and his testimony is based on that review. (*Id.* ¶ 14.)

Not only have defendants not objected to the affidavit of Dr. Sullivan, defendants have not offered any evidence to counter Dr. Sullivan's testimony. *See Berry*, 855 F.Supp. at 259 (explaining that "the facts asserted in an uncontroverted affidavit will be taken as true on summary judgment"). Defendants have not offered any evidence that the records do

indicate that Penoyer had a disease or disorder of the aorta. Nor have defendants offered any evidence that any of the problems indicated in the records gave New England Mutual notice that Penoyer may be suffering from aortic disease. *See Massachusetts Mut. Life Ins. Co. v. O'Brien*, 5 F.3d 1117, 1121 (7th Cir.1993) ("[T]here must be a close relationship between the original disclosed condition and the intervening, undisclosed illness: the first must put the insurer 'on notice' of the second."). In fact, the only evidence that defendants have offered on this issue is the one page of Dr. Lewis' records. However, that page was part of the records considered by Dr. Sullivan, which Dr. Sullivan testified gave no indication that Penoyer had a history of aortic aneurysm or any other disorder or disease of the aorta. Thus, defendants have failed to present competent evidence which raises a genuine issue of fact as to whether New England Mutual had knowledge of Penoyer's history of aortic disease through the medical records of Dr. Lewis. *See Smith*, 129 F.3d at 427 ("[A] party will be successful in opposing summary judgment only when they 'present definite, competent evidence to rebut the motion.' ").

A closer question, one not raised by defendants, is whether the information contained in Dr. Lewis' records somehow imposed on New England Mutual a duty to conduct an investigation into the answers in Penoyer's application. In Illinois, it is well established that an insurance company may rely on the truthfulness of an insurance applicant's answers and has no duty to conduct an independent investigation into the application's answers. *Garde*, 101 Ill.Dec. 120, 498 N.E.2d at 308; *Garde*, 842 F.2d at 178; *Apolskis*, 445 F.2d at 35; *Commercial Life Ins. Co.*, 727 F.Supp. at 471. However, when an insurance company has reasonable notice that an insurance application contains false answers, the company may be under a duty to investigate the correctness of those answers. *National Boulevard Bank v. Georgetown Life Ins. Co.*, 129 Ill.App.3d 73, 84 Ill.Dec. 330, 331, 472 N.E.2d 80, 81 (1984); *Apolskis*, 445 F.2d at 36; *Gibler v. Midwest Computer Register Corp.*, No. 86 C 3111, 1987 WL 17817, at *2 (Sept. 23, 1987); *Gibler v. Midwest Computer Register Corp.*, No. 86

C 3111, 1986 WL 15099, at *5 (N.D.Ill. Dec.23, 1986) (explaining that there must be "reasonable notice of falsity").

 Based on the facts of this case, the court finds that New England Mutual did not have a duty to conduct a further investigation into Penoyer's answers. It is true that Dr. Lewis' records gave New England Mutual notice that Penoyer had answered question 2(d) of the paramedical portion of the exam incorrectly because Dr. Lewis' records indicate that Penoyer had had an indication of chest pains prior to June 26, 1985. However, the undisputed evidence submitted by New England Mutual is that all of the tests performed on Penoyer while he had been seeing Dr. Lewis were within normal limits, with the exception of mildly elevated blood pressure. (Sullivan Aff. ¶ 14). All of these tests were performed subsequent to the June 26, 1985 initial visit. It is also undisputed that (1) nothing in Dr. Lewis' records indicated that Penoyer had a history of aortic disease and (2) nothing in Dr. Lewis' records indicated that the policy should be rated at a higher rate or declined. Further, there is no evidence that Penoyer gave ambiguous or implausible answers, *see Boyles v. Freeman,* 21 Ill.App.3d 535, 315 N.E.2d 899, 902 (1974), or that New England Mutual had in its possession direct evidence of prior inconsistent answers, *see Government Employees Ins. Co. v. Govan,* 451 A.2d 884, 886 (D.C. 1982). Similarly, there is no evidence that New England Mutual had reasonable notice that Penoyer's omissions were made in bad faith in an attempt to cover up a serious medical condition. Thus, New England Mutual was not required to conduct a further investigation into Penoyer's application.

Further, question 2(d) is not the critical question in this case. The critical questions are questions 45 ("Have you ever been treated or diagnosed as having ... High blood pressure; stroke, or disease of heart, blood or circulatory system?"), 46 ("Other than above, have you within the past 5 years: had a checkup or consultation; been a patient in a medical facility; or been advised to have any diagnostic test, hospitalization or surgery?"), and 4(a), (b), and (d) ("Other than the above have you within the past 5 years: Had any mental or physical disorder? Had a checkup consultation, illness, injury or sur-

gery? ... Had an electrocardiogram, x-ray or other diagnostic test?"). There is nothing in Dr. Lewis' records which gave New England Mutual reasonable notice that Penoyer answered question 45, 46, 4(a), 4(b), or 4(d) falsely. Thus, New England Mutual was entitled to rely on Penoyer's answers to these questions and was not required to conduct an independent investigation into these answers. *See Gibler,* 1987 WL 17817, at *2.

In sum, the only reasonable inferences from the record are that Penoyer made false statements on his application and that New England Mutual relied on those false statements when it issued the policy. There is no evidence from which an inference reasonably could be drawn that New England Mutual knew about Penoyer's medical condition or that New England Mutual was required to conduct a further investigation into Penoyer's application. Thus, Penoyer's failure to disclose the many facts related to his history of aortic disease constituted misrepresentations within the meaning of section 154 of the Illinois Insurance Code.

### 2. Materiality

 New England Mutual must also show that the only reasonable inference from the record is that Peroyer's misrepresentations either were made with an intent to deceive or were material to the risk assumed. A misrepresentation is material if "reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application." *Small v. Prudential Life Ins. Co.,* 246 Ill.App.3d 893, 186 Ill.Dec. 841, 844, 617 N.E.2d 80, 83 (1993); *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308; *Methodist Med. Ctr.,* 38 F.3d at 320. A material misrepresentation will avoid the contract even though made through mistake or good faith. *Campbell,* 155 N.E.2d at 11; *Cohen,* 124 Ill.Dec. 948, 529 N.E.2d at 1067; *Garde,* 101 Ill.Dec. 120, 498 N.E.2d at 308. Thus, if the misrepresentation is material to the risk assumed, it did not have to be made with an intent to deceive in order for the policy to be avoided. *Campbell,* 155 N.E.2d at 11; *Ratcliffe v. International Surplus Lines Ins. Co.,* 194 Ill.App.3d

18, 141 Ill.Dec. 6, 11, 550 N.E.2d 1052, 1057 (1990); *Home Ins. Co. v. Dunn*, 963 F.2d 1023, 1026 (7th Cir.1992). The fact that the insured does not die from the misrepresented ailment does not affect the materiality of a misrepresentation. *Campbell*, 155 N.E.2d at 11; *Weinstein*, 60 N.E.2d at 210; *Garde*, 101 Ill.Dec. 120, 498 N.E.2d at 308; *Hatch*, 42 Ill.Dec. 925, 409 N.E.2d at 543.

■ Materiality can be established by the testimony of the insurer's underwriter or employees. *Small*, 186 Ill.Dec. 841, 617 N.E.2d at 83; *Cohen*, 124 Ill.Dec. 948, 529 N.E.2d at 1067; *Garde*, 101 Ill.Dec. 120, 498 N.E.2d at 308; *Allender v. Guardian Life Ins. Co.*, 592 F.Supp. 541, 543 (N.D.Ill.1984). The materiality of a misrepresentation is a question of fact; however, summary judgment is appropriate where the misrepresentation is of such a nature that no one would dispute its materiality. *Northern Life Ins. Co.*, 176 Ill.Dec. at 81, 601 N.E.2d at 779; *Cohen*, 124 Ill.Dec. 948, 529 N.E.2d at 1067; *Garde*, 101 Ill.Dec. 120, 498 N.E.2d at 308; *Commercial Life Ins. Co. v. Lone Star Life Ins. Co.*, 727 F.Supp. 467, 470 (N.D.Ill.1989); *Methodist Med. Ctr.*, 38 F.3d at 320.

In this case, New England Mutual submitted the affidavit of Dr. Sullivan. *See infra* Part II.C.1.b (discussing Dr. Sullivan's credentials). In his affidavit, Dr. Sullivan testified that "Penoyer's history of an aortic aneurysm, aortic insufficiency, aortic stenosis, aortic regurgitation, and aortic dilatation ... substantially increased the chances of his death and was material to the risk assumed by New England in insuring his life." This testimony was based on Dr. Sullivan's medical training and his twenty-four years of experience in life insurance underwriting. Dr. Sullivan also testified that if the omitted medical history had been disclosed, New England Mutual would not have issued the policy. This testimony was based on Dr. Sullivan's position as Second Vice President and Medical Director and his familiarity with New England Mutual's underwriting practices and underwriting manual. (Sullivan Aff. ¶ 15.)

7. Because the court finds that the misrepresentation was material, the court need not address New England Mutual's alternative argument that the policy is void because Penoyer made the misrepresentations with the intent to deceive.

■ Defendants have offered no evidence to counter Dr. Sullivan's testimony. In fact, defendants have not even argued that there is a genuine issue of fact as to whether the misrepresentations were material. Thus, even when viewing the record in the light most favorable to defendants, the court finds that the only reasonable inference from the record is that Penoyer's misrepresentations were material to the risk assumed by New England Mutual.[7] *See Small*, 186 Ill.Dec. at 850, 617 N.E.2d at 89 (finding the misrepresentation was material where the insurer offered testimony from its underwriter to that effect and the insured failed to counter that testimony); *Cohen*, 124 Ill.Dec. 948, 529 N.E.2d at 1067 (same).

## D. *Estoppel*

■ Defendants argue that New England Mutual is estopped from relying on the misrepresentations because New England Mutual knew about Penoyer's medical condition prior to issuing the policy. In Illinois, the general rule is that an insurer who knows the truth about an insurance applicant's medical condition before issuing the policy is estopped from avoiding the policy on the basis that the insured made material misrepresentations about that condition in the application. *See Moone v. Commercial Cas. Ins. Co.*, 350 Ill.App. 328, 112 N.E.2d 626 (1953); *Nogulich v. Metropolitan Life Ins. Co.*, 317 Ill.App. 411, 46 N.E.2d 396 (1943); *Smith v. Metropolitan Life Ins. Co.*, 550 F.Supp. 896 (N.D.Ill.1982). Defendants argue that New England Mutual knew about Penoyer's condition through (1) its agent Carbon and (2) the records of Dr. Lewis.

These are the same arguments that defendants made in support of defendants' argument that New England Mutual could not have relied on Penoyer's misrepresentations. As before, the court finds it is not reasonable to infer that New England Mutual knew about Penoyer's history of aortic disease before issuing the policy. First, because Penoyer acted in bad faith, the court will not

*Campbell*, 155 N.E.2d at 11; *Northern Life Ins. Co.*, 176 Ill.Dec. 75, 601 N.E.2d at 779; *Ratcliffe*, 141 Ill.Dec. 6, 550 N.E.2d at 1057; *Home Ins. Co.*, 963 F.2d at 1026.

impute whatever knowledge Carbon had to New England Mutual. Second, the uncontroverted evidence is that Dr. Lewis' records "gave no indication that Fred H. Penoyer had a history of an aortic aneurysm or any other disease of disorder of the aorta." (Sullivan Aff. ¶ 14.) Thus, New England Mutual is not estopped from relying on the misrepresentations about Penoyer's history of aortic disease to avoid the policy.

### III. CONCLUSION

In sum, the record establishes that Fred Penoyer made material misrepresentations in his application for a life insurance policy from New England Mutual Life Insurance Company. New England Mutual is not estopped from relying on those misrepresentations to avoid the policy. Thus, pursuant to section 154 of the Illinois Insurance Code, 215 ILCS § 5/154, New England Mutual is entitled to rescind the Ordinary Life Insurance Policy Number 8821001, which was issued to Fred Penoyer.

Accordingly, the court grants plaintiff New England Mutual Life Insurance Company's motion for summary judgment. The court grants judgment in favor of plaintiff New England Mutual Life Insurance Company on its claim for rescission. Ordinary Life Insurance Policy Number 8321001 is rescinded, and plaintiff has no obligations or liability thereunder except to refund the premiums paid. Because the court has entered judgment on plaintiff's claim for rescission, plaintiff's claim for declaratory judgment is rendered moot. Final judgment is entered in this case in favor of plaintiff New England Mutual Life Insurance Company and against defendants Bank of Illinois in DuPage, Leslie F. Penoyer, Kathryn G. Penoyer, Fred L.B. Penoyer, Lynette J. Penoyer, and Alana Smaldone.